

FILED

Nov 07 2018, 1:07 pm

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



IN THE

# Indiana Supreme Court

Supreme Court Cause No. 10S00-1507-PD-413

## Jeffrey A. Weisheit,

*Appellant (Petitioner Below)*

—v—

## State of Indiana

*Appellee (Respondent Below)*

---

Argued: September 7, 2017 | Decided: November 7, 2018

Appeal from the Clark Circuit Court
Cause No. 10C01-1601-PC-1

The Honorable Andrew Adams, Judge

On Direct Appeal

---

**Opinion by Justice David**
Justice Massa and Justice Goff concur.
Justice Slaughter concurs in part and in the judgment with separate opinion.
Chief Justice Rush concurs in part and dissents in part with separate opinion.

**David, Justice**

Jeffrey Weisheit was convicted of the murders of two children as well as arson. His convictions were affirmed on direct appeal. He subsequently sought and was denied post-conviction relief, alleging that both his trial and appellate counsel were ineffective. We affirm the post-conviction court, finding that although counsel made some mistakes, most of them do not rise to the level of deficient performance pursuant to *Strickland*, and in any case, Weisheit fails to demonstrate that he was prejudiced.

# Facts and Procedural History

In April 2010, Jeffrey Weisheit was living with his pregnant girlfriend, Lisa Lynch, and her two children: eight-year-old Alyssa and five-year-old Caleb. Weisheit was caring for the children one night while his girlfriend worked. He bound and gagged Caleb, set fire to the home, and fled the state. Both children died in the fire.

Police located Weisheit in Kentucky. Weisheit resisted and officers had to tase him to effect his arrest. Weisheit fell and hit his head. He was taken to the hospital and diagnosed with a concussion.

In 2013, a jury convicted Weisheit of two counts of murder and one count of Class A felony arson resulting in serious bodily injury. The jury found the State had proven the alleged aggravating circumstances—multiple murders and that each child was under the age of twelve—beyond a reasonable doubt, found the aggravators outweighed any mitigators, and recommended the death penalty. The trial court sentenced Weisheit accordingly, and this Court affirmed the convictions and sentence on direct appeal. *Weisheit v. State*, 26 N.E.3d 3 (Ind. 2015) (unanimous opinion by David, J.).

Weisheit sought post-conviction relief, alleging multiple instances of ineffective assistance by trial and appellate counsel. The trial court denied Weisheit's petition in November 2016. Weisheit now appeals. Additional facts will be provided as necessary.

## Standard of Review

Post-conviction proceedings are civil proceedings in which a defendant may present limited collateral challenges to a conviction and sentence. *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013). The defendant bears the burden of establishing his claims by a preponderance of the evidence. *Id.* The defendant must convince this Court that there is "no way within the law that the court below could have reached the decision it did." *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002).

## Discussion

Weisheit argues that he received ineffective assistance of both trial and appellate counsel. He faults trial counsel in six areas: 1) errors during the penalty phase of trial; 2) failures regarding the admissibility of expert testimony; 3) failure to appropriately question jurors; 4) failure to adequately present evidence in support of suppressing pretrial statement; 5) failure to object to opinion testimony about the nature and origin of the fire; and 6) cumulative errors. Weisheit faults appellate counsel for failing to sufficiently identify objectionable jurors on direct appeal.

Ineffective assistance of counsel claims are evaluated under the two-part test articulated in *Strickland v. Washington*, 466 U.S. 668 (1984). To prevail, Weisheit must show: 1) that counsel's performance was deficient based on prevailing professional norms; and 2) that the deficient performance prejudiced the defense. *Ward v. State*, 969 N.E.2d 46, 51 (Ind. 2012) (citing *Strickland, 466* U.S. at *687*).

In analyzing whether counsel's performance was deficient, the Court first asks whether, "'considering all the circumstances,' counsel's actions were 'reasonable [ ] under prevailing professional norms.'" *Wilkes*, 984 N.E.2d at 1240 (quoting *Strickland, 466* U.S. at 668). Counsel is afforded considerable discretion in choosing strategy and tactics, and judicial scrutiny of counsel's performance is highly deferential. *Id.*

To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland,* 466 U.S. at 694.

There is a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Stevens*, 770 N.E.2d at 746. Counsel is afforded considerable discretion in choosing strategy and tactics and these decisions are entitled to deferential review. *Id.* at 746-47 (citing *Strickland*, 466 U.S. at 689). Furthermore, isolated mistakes, poor strategy, inexperience and instances of bad judgment do not necessarily render representation ineffective. *Id.* at 747 (citations omitted).

# A. Trial Counsel

## 1. Errors during the penalty phase of trial

### a. Failure to obtain Boys School Records and to prepare certain experts

This Court and the United States Supreme Court have found that capital defendants are entitled to adequate representation at the penalty phase of trial. *See Rompilla v. Beard*, 545 U.S. 374, 382-93 (2005); *Williams v. Taylor*, 529 U.S. 362, 395-98 (2000); *Smith v. State*, 547 N.E.2d 817, 821-22 (Ind. 1989). "A decision by defense counsel not to present evidence can be deemed reasonable only if it is 'predicated on a proper investigation of the alleged defense.'" *Smith*, 547 N.E.2d at 821 (quoting *Thomas v. State*, 242 N.E.2d 919, 924 (Ind. 1969)).

Weisheit first argues that he was denied effective assistance during the penalty phase of trial because trial counsel did not fully investigate and obtain pertinent mental health records. Specifically, he faults counsel for

not obtaining his records from the Indiana Boys School. He points to the post-conviction court's conclusion that these records (which were obtained for the post-conviction hearing from the Indiana Archives) contained valuable mitigation evidence that was not provided to the jury. Weisheit also argues that had these records been provided to experts, their testimony would have been more compelling.

Here, trial counsel requested the records, but received a response from the Boys School that they were not available and that pursuant to its document retention policy, documents from that time period would have been destroyed. Nevertheless, defense counsel found other documents and mental health records and provided them to mental health experts.

While Weisheit faults trial counsel for only making one attempt to obtain the Boys School records, it does not seem that counsel was deficient for not making multiple attempts given that counsel was told by the Boys School that there was no match for the records and that records over 10 years old were destroyed, and counsel did obtain other mental health records from other sources. Had counsel been told the records were moved to the archives or even told they could not be located, it would have made sense to fault counsel for not pursuing them further. However, this is not the case. The dissent believes that counsel should have followed up by calling the Department of Correction because the Department noted in response to the records request to "feel free to contact" them with "[a]ny further questions." However, in response to being told there was no match for the requested records and further that records over 10 years old would be destroyed, it's not clear what "further questions" there are to ask at that point. Nor can we say that if counsel called that they would have been told that the records were, in fact, available elsewhere or been given any other new information. All the information pointed to the records not being available from the Boys School.

Weisheit also faults counsel for not providing these records to some of the testifying witnesses (Dr. Henderson-Galligan- licensed psychologist and Deborah Eccles-Skidmore- Weisheit's Boys School counselor) because if they had the records and were prepared using them, they would have

been more compelling mitigation witnesses. While perhaps this is the case, it is not clear that counsel's performance was deficient by not preparing witnesses in a more ideal or preferred way. Weisheit's best claim in this regard is that counsel failed to appropriately prepare Eccles-Skidmore by failing to inform her that she would be subject to cross-examination. Counsel should have done at least that much.

However, even assuming counsel was deficient in failing to appropriately prepare Eccles-Skidmore, Weisheit has not demonstrated prejudice. During trial, counsel did present evidence of Weisheit's mental health struggles throughout his life and his various mental health diagnoses. For instance, Boys School counselor Eccles-Skidmore, testified that Weisheit was in the Boys School for a time, attempted suicide while there, and was admitted to Methodist Hospital as a result. Defense witness, Dr. Price, reviewed records from throughout Weisheit's life, including academic records, hospital and other medical records, police records, prior psychotherapy records, prior evaluation records, etc. He also personally evaluated Weisheit on four different occasions. Dr. Price testified regarding the history of mental illness in Weisheit's family, Weisheit's history of brain/head injuries, and his diagnoses that Weisheit had bipolar disorder not otherwise specified (NOS), attention deficient hyperactivity disorder (ADHD), predominant hyperactive impulse and cognitive disorder NOS. He also testified that he disagreed with Dr. Allen (the State's expert) that Weisheit did not meet the diagnostic criteria for bipolar disorder and explained why he disagreed.

Dr. Henderson-Galligan, who was initially appointed by the trial court to do a competency evaluation, met with Weisheit on two occasions and reviewed his background and mental health records including both Dr. Price and Dr. Allen's reports. She testified that Weisheit was competent to stand trial and further, she diagnosed him with bipolar disorder NOS, cognitive disorder NOS and personality disorder NOS with Cluster B characteristics. During the post-conviction hearing, Dr. Henderson-Galligan testified that while the missing records contained significant information, nothing in those documents conflicted with her opinion at trial.

Weisheit points to arguments the State made during its closing wherein it downplayed the impact of his mental illness and argued that he was a manipulator. He argues that with the additional information contained in the Boys School records, he could have forcefully countered those arguments. He also argues that counsel could have used information from the records to argue that Weisheit was suffering from a psychotic break at the time of the murders.

However, looking at the record, Weisheit's trial counsel did, in fact, make arguments about Weisheit's significant history of psychological problems since childhood and possible mania at the time of the murders. Counsel pointed to Weisheit's records that are "rife with suicide attempts, depression, medication. . ." and the fact that during childhood he was never "totally adequately treated." (Tr. 2560.) When discussing Weisheit's mental health, counsel stated that "at some point a major disruption occurs which pushes one over the edge. . . to what we call acute mania." (Tr. 2562.) "In this case, it happened with tragic results." (Tr. 2562-63.) Accordingly, despite not having the aid of the Boys School records, counsel was able to present a rather complete picture of Weisheit's mental health at trial.

Finally, as the State notes, Weisheit's Boys Schools records contained information that was potentially prejudicial to Weisheit, including multiple references to Weisheit's lack of remorse and records containing descriptions of Weisheit's poor behavior that led to several juvenile adjudications. For instance, Weisheit had adjudications for burglaries, auto theft, running away, fighting, making threats, stealing weapons and other misbehavior at school. The records also make reference to Weisheit's lack of remorse for his behavior and his cruelty to animals. It is not clear that introduction of these additional records would have helped Weisheit. Accordingly, Weisheit has not demonstrated that counsel was ineffective by not obtaining the records or using them to prepare witnesses.

## b. Failure to call witnesses

Weisheit also faults trial counsel for not calling certain witness,

including Dr. Harvey, an expert retained by the defense, and Dr. Gur, an expert regarding Weisheit's traumatic brain injuries.

*Dr. Harvey*

Dr. Harvey performed a mental health assessment of Weisheit in 2010. After that assessment, Dr. Harvey's terms of employment changed, and he no longer had direct contact with individuals in forensic cases. Dr. Harvey stated he could testify only as to his prior assessment and offered to find someone else who could do a future assessment. Dr. Harvey sent counsel a memorandum reporting his observations during his 2010 meeting with Weisheit and detailing his impressions of Weisheit's mental health. The defense team did not pursue further services from Dr. Harvey, but instead, engaged another psychologist (Dr. Price), who received Dr. Harvey's memorandum, incorporated it into his own assessment, and testified at trial.

Weisheit argues that ". . . Dr. Harvey would have tipped the balance for the jury or sentencing court from finding no mitigating circumstances to finding they existed." (Appellant's Brief at 42.) He believes Dr. Harvey's testimony regarding his first-hand observation of Weisheit in a manic state was crucial to rebut the State's evidence and secure a different sentence. However, as discussed above, even without Dr. Harvey's testimony about the instance of mania he observed, trial counsel did in fact present evidence of Weisheit's bipolar diagnosis and possible mania at the time of the murders. Further, Dr. Price reviewed Dr. Harvey's report prior to serving as a testifying witness. Counsel was not ineffective for not pursuing further services from Dr. Harvey after he contacted counsel, told counsel he could not do future evaluations and indicated he would recommend his replacement. Further, even though counsel mistakenly believed Dr. Harvey could not testify about his prior assessment, Weisheit was not prejudiced because another expert capably testified about Weisheit's mental health conditions.

*Dr. Gur*

Dr. Gur, a neuropsychologist with expertise in brain injury and behavior, testified at Weisheit's PCR hearing regarding how the multiple brain injuries Weisheit incurred would have exacerbated his mental health conditions. Weisheit argues that counsel was ineffective for not presenting this evidence at trial. However, because Dr. Gur could not point to medical evidence of Weisheit's alleged brain injuries and another expert disagreed with his conclusion, Weisheit is asking this Court to reweigh the evidence on this issue which we will not do.

The post-conviction court determined that evidence of Weisheit's injuries was available to trial counsel, and counsel's failure to further investigate the injuries and their effects was unreasonable. However, the court found that even at the post-conviction hearing, Weisheit presented no conclusive medical evidence that he actually suffered from traumatic brain injuries or the other effects Dr. Gur suggested could result from such injuries.

We agree that the evidence of Weisheit's brain injuries is speculative. Dr. Gur admitted that just because someone has hit their head, even multiple times, this does not necessarily mean they suffer a concussion and further, that even sustaining a concussion does not guarantee permanent brain injury. He further admitted that he did not interview Weisheit; his opinion that Weisheit suffered from concussions was largely based on Weisheit's self-reports and he could not point to medical records that documented each of the alleged concussions or other traumatic brain injury. His testimony was significantly undermined when he stated that it "seems like" Weisheit suffered from concussions. (PCR Tr. Vol. I. at 95.) Thus, it is not clear how reliable or helpful Dr. Gur's testimony would have been during trial.

Further, another expert, Dr. Westcott, disagreed with Dr. Gur that Weisheit sustained traumatic brain injuries. She testified that while there were instances where Weisheit suffered injury to his head, there was no medical evidence to show he had concussions or traumatic brain injuries, except for the instance where he hit his head when he was tased during his arrest for the present crimes.

In sum, Weisheit has failed to show a reasonable likelihood of a different outcome had either Dr. Harvey or Dr. Gur testified. Dr. Price testified in Dr. Harvey's place and the utility of Dr. Gur's testimony is questionable at best.

## 2. Failures regarding the admissibility of expert testimony

At trial, counsel intended to call James Aiken, a former prison warden and consultant, to testify that Weisheit could be adequately managed and secured under a life sentence without presenting danger to prison staff, other inmates, or the public. Aiken's testimony was not presented, however, because the trial court found he was not qualified as an expert under Indiana Evidence Rule 702(b) and counsel withdrew him. On direct appeal, this Court affirmed the exclusion of Aiken's testimony because Aiken's proposed opinion concerned Weisheit's future adjustment to prison, and counsel neither established Aiken's qualifications to predict future behavior, nor did he make an offer of proof as to Aiken's specific predictions of Weisheit's potential future classification in prison. *See Weisheit*, 26 N.E.3d at 10.

Weisheit now argues that counsel was ineffective for failing to point the trial court to the correct rule of evidence—702(a)—under which Aiken would have qualified as an expert.[1] The post-conviction court agreed that the trial court erred in excluding Aiken's testimony under 702(b), and found Aiken was qualified under 702(a). It further found that "[h]ad the jury heard this mitigating evidence, there is a reasonable likelihood the jury would have given Weisheit's case for mitigation greater weight and returned a verdict for something less than death." (PCR Order at 14.) Nevertheless, despite making such a strong statement, the court found

---

1 A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue. Ind. R. Evid. 702(a).

that Weisheit did not demonstrate prejudice and denied his ineffective assistance claim.

Despite contradictory statements in its order, the post-conviction court came to the correct conclusion. As the State points out, even assuming Aiken could qualify under 702(a), it is not clear that he actually would have been allowed to testify. The trial court is not required to accept the opinion of experts. *Wilkes v. State*, 917 N.E.2d 675, 690 (Ind. 2009) (citing *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004)).

In this case, with regard to his preparation to serve as an expert witness, Aiken testified that he spent just 30 to 45 minutes with Weisheit the night prior to appearing in court and that he reviewed Weisheit's prison records provided by counsel and some annual reports online. He did not use any structure or assessment tool when evaluating Weisheit. He struggled to answer the trial court's questions about his training and experience. He admitted he had not reviewed anything regarding how an Indiana prison would house an inmate convicted of murdering children. It is speculative to say Aiken's testimony would have been admissible.

Further, even if Aiken had testified, the prior prison records of Weisheit undercut Aiken's claims and demonstrate Weisheit's propensity for violence and odd behavior. Thus, Aiken would not have aided his mitigation cause. For instance, 35 incident reports were filed regarding Weisheit from April 2010 to May 2011. Incidents include Weisheit threatening to kill an EMT who was dispensing medication, threatening officers and challenging them to fight him, threatening other inmates, destroying several pieces of jail property, urinating in the hallway and concealing "multiple, sharp chicken bones" in his mouth during a search. (PCR Exhibit L.) Accordingly, it is not clear that Aiken's testimony would have been given great weight and that there's a reasonable probability that the outcome would have been different had Aiken testified.

## 3. Failure to appropriately question jurors

Indiana Code Section 35-50-2-9(e) states that the jury in a capital case "shall recommend to the court whether the death penalty or life imprisonment without parole, or neither, should be imposed." *See Wrinkles v. State*, 749 N.E.2d 1179, 1198 (Ind. 2001) (statute requires that the jury be instructed as to all three possible penalties). Qualified jurors must be willing to consider all of the possible penalties. *Burris v. State*, 465 N.E.2d 171, 177 (Ind. 1984). This principle flows from United States Supreme Court jurisprudence, which requires that jurors in capital cases must be willing to follow the law (including instructions indicating all of the possible penalties) and must be excused if their personal views of the death penalty (whether pro or con) "would prevent or substantially impair" their ability to follow their oath and the law. *Ritchie v. State*, 875 N.E.2d 706, 726-27 (Ind. 2007) (quoting *Wainwright v. Witt*, 469 U.S. 412, 420 (1985)); see also *Greene v. Georgia*, 519 U.S. 145, 146 (1996) ("*Witt* is the controlling authority as to the death-penalty qualification of prospective jurors.") (internal quotation and citation omitted); *Adams v. Texas*, 448 U.S. 38, 45 (1980) (Jurors must be excused if their views on the death penalty "would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."); *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968).

It is presumed that jurors follow their instructions. *Richardson v. Marsh*, 481 U.S. 200, 206-07 (1987). Here, the jury was instructed on death, life imprisonment without parole, and a term of years as the three sentencing options. Nevertheless, Weisheit alleges that counsel's performance was deficient when, during voir dire, counsel did not ask five jurors if they would be willing to consider a term of years as a sentencing option if they found Weisheit guilty.

Jurors or potential jurors were asked in their questionnaires about their thoughts about a sentence of a term of years for a person convicted of intentionally murdering children. The responses for the five jurors at issue were as follows:

Juror 7: "I would feel justice was not truly served and a dangerous person could be set free."

Juror 15: "He should never get out."

Juror 75: "Should include 'without the possibility of parole.'"

Juror 160: "Is not appropriate for crime."

Juror 167: "I don't think this is a fair sentence especially if they are guilty of murder."

(PCR Ex. 9- Exhibit Supp. 1 & 2.)

Weisheit alleges that trial counsel did not follow up and ask the jurors if they would follow the law and consider one of the three possible sentencing options and that he was prejudiced by this because jurors went into the trial rejecting a term of years as a possible sentence.

Relying on this Court's decision in *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013), the post-conviction court determined it was reasonable for counsel's strategy to focus on identifying and screening those jurors that would automatically vote for the death penalty. The court found answers on the preliminary jury questionnaire did not establish prejudice by showing a reasonable likelihood of a different outcome in the penalty phase, and Weisheit presented no evidence that any juror indicated he or she would not fully consider a term of years sentence.

We agree. First, Weisheit has not identified any duty or requirement that trial counsel had to ask specific questions of jurors for them to be qualified. Additionally, despite their responses on the questionnaires, several of these jurors said that they would look at all the evidence and mitigators when determining punishment, that they would have an open mind, etc. Juror 7 agreed that the death penalty is not always the right thing to do and that such a sentence depends on the facts and circumstances of an individual case. Juror 15 stated she would consider mitigation evidence including mental health status when deciding an appropriate sentence. Juror 75 was instructed about the different

sentencing options and was told "death is different." (Tr. 646.) He was told about the State's burden to prove aggravating circumstances to support a death sentence. He did not say much about his view of the death penalty; however, he said nothing that would indicate he would not consider a term of years. Juror 160 stated she would weigh the evidence and that she couldn't say she had any particular feelings about the death penalty one way or the other. She would weigh the evidence presented. She also stated she would not take the decision lightly. Finally, Juror 167 stated twice that she would keep an open mind.

Counsel was not deficient for not further questioning the five jurors at issue because they are presumed to follow the law, counsel was not required to ask certain questions, the jurors were in fact instructed and asked about the three sentencing options, and none of them said anything during voir dire to indicate they would not consider a term of years. The term of years option was repeatedly mentioned throughout trial.

Further, the jury's verdict was unanimous and of course, a child murderer would not engender much sympathy from a jury, despite defense counsel asking about sentencing options. Accordingly, Weisheit cannot demonstrate prejudice. His ineffective assistance of counsel claims related to the questioning of the jurors fail.

## 4. Failure to adequately present evidence in support of suppressing pretrial statement

Weisheit suffered injuries, including a concussion, during his arrest and was hospitalized. During that time, he was interviewed by police and gave a statement indicating that he was the last person to see the children alive. That is, he stated that he left the children in the home because he did not want them with him, and just started driving. He did not know if he set the fire or how the fire started. Before giving the statement, the officer read Weisheit his *Miranda* rights and he indicated he understood them. The officer did not ask if Weisheit was waiving his rights, and though she had a waiver of rights form, Weisheit "[d]idn't seem to

acknowledge it as far as [ ] wanting to sign it."  (PCR Ex. Vol. III at 52.)
The police then questioned Weisheit until he asked for a lawyer.

Trial counsel moved to suppress the statement on the basis that
Weisheit did not knowingly, intelligently, and voluntarily waive his
*Miranda* rights.  At the hearing on the motion to suppress, trial counsel
focused on Weisheit's medical condition at the time of the interview.  The
trial court denied the motion to suppress, and this Court affirmed on
direct appeal.  *See Weisheit*, 26 N.E.3d at 18.  Weisheit now argues that
failure to introduce the officer's testimony about his response (or lack of
response) to the waiver form was deficient performance.

The post-conviction court agreed that the officer's testimony would
have supported an argument that Weisheit's *Miranda* waiver was invalid,
which trial counsel (and appellate counsel) did not make.  But the court
credited trial counsel's testimony at the post-conviction hearing that this
omission was strategic, because counsel knew that a waiver could not be
invalid solely based on lack of a written waiver.  (PCR Order at 32-34
(citing, e.g., *Berghuis v. Thompkins*, 560 U.S. 370, 384-86 (2010)).  The court
also found Weisheit had not shown a reasonable likelihood of a different
outcome had counsel made the argument below.

Weisheit argues the post-conviction court's conclusions were
erroneous.  Citing to *Mendoza-Vargas v. State*, 974 N.E.2d 590, 595 (Ind. Ct.
App. 2012), he argues that his not wanting to sign the acknowledgement
form was akin to his refusal to waive his rights.  However, the validity of
a waiver is judged by the totality of the circumstances.  *Berghuis*, 560 U.S.
at 384.  In *Mendoza-Vargas*, a defendant who spoke Spanish shook his head
no when he was asked if he wanted to answer questions after being given
his Miranda rights.  *Mendoza-Vargas,* 974 N.E.2d at 593. Nevertheless,
police continued to question him.  *Id*.  In contrast, here, while Weisheit did
not seem to want to sign the form, his conduct indicated that he wanted to
answer police questions.  As we noted on direct appeal, he selectively
feigned sleep based on the subject matter of the questions but was
otherwise responsive and the interview, which was brief in duration,
ceased when Weisheit asked for an attorney.  *Weisheit* 26 N.E.3d at 18.
Thus, counsel was not deficient for not raising the issue of Weisheit

seeming to not want to sign the waiver form because it is not clear that such a challenge would have been successful in light of the totality of the circumstances which showed Weisheit's willingness to speak with police initially.

Further, as the State notes, at the time police spoke to Weisheit, they did not know where at least one of the child victims was. Thus, police were authorized to speak to Weisheit and his statements would have been admitted into evidence pursuant to the public safety exception.

Finally, in light of the overwhelming evidence of Weisheit's guilt, Weisheit has failed to show a reasonable likelihood that the outcome of trial would have been different had the statement not been admitted.

## 5. Failure to object to opinion testimony about the nature and origin of the fire

At trial, the State offered three witnesses who testified about the nature and origin of the fire. The assistant chief of the local fire department, who was at the scene, opined the fire was intentionally set. The state fire marshal who investigated the fire opined the fire was intentionally set. The lead detective on the case testified it was her opinion the fire was intentionally set by Weisheit.

The post-conviction court found these opinions were inadmissible and would have been excluded had an objection been made. (PCR Order at 36.) (citing Ind. Evid. R. 704(b), "Witnesses may not testify to opinions concerning intent, guilt or innocence in a criminal case . . . or legal conclusions.")) The court found counsel's failure to object was deficient performance because no strategy supported it, counsel did not object because he was not the questioning attorney, and he thought co-counsel should have objected. But the post-conviction court ultimately found no prejudice, because substantial other evidence—like Weisheit's flight after the fire and one child's condition of being bound and gagged—supported the conclusion Weisheit intentionally started the fire.

The State argues that the post-conviction court erred because the assistant fire chief's and the fire marshal's opinions were properly admitted. The State is correct that expert testimony regarding the cause of a fire (that does not tie the defendant to the fire) does not run afoul of Evidence Rule 704(b). *See Julian v. State*, 811 N.E.2d 392, 399-400 (Ind. Ct. App. 2004), *trans. denied*. (state fire marshal's opinion that fire was intentionally set was admissible where testimony did not reference defendant). Accordingly, counsel was not deficient for not objecting to the admission of the fire chief and fire marshal's statements.

As for the lead detective's testimony, as the State notes, this testimony was elicited on cross by the State in response to the defense's direct wherein the defense questioned the thoroughness of the detective's investigation. While defense counsel arguably could have objected, it is not clear such an objection would be sustained because defense counsel may have opened the door. Weisheit does not challenge the appropriateness of his trial counsel's strategy to challenge the detective's thoroughness.

In any case, even if counsel was deficient for not objecting to and/or opening the door to the detective's testimony, Weisheit has not demonstrated prejudice. As the post-conviction court aptly noted, this expert testimony was "not nearly as persuasive as Weisheit's actions before, during, and after the crime." (PCR Order at 37.)

## 6. Cumulative errors

Generally, trial errors that do not justify reversal when taken separately also do not justify reversal when taken together. *Smith,* 547 N.E.2d at 819. However, in the context of ineffective assistance of counsel, a reviewing court also assesses whether "the cumulative prejudice accruing to the accused" as a result of counsel's errors has "rendered the result unreliable, necessitating reversal under *Strickland*'s second prong." *Id.* at 819-20 (internal citations omitted).

Weisheit faults trial counsel on many grounds as discussed above. Also, this Court notes that in the post-conviction court's findings of fact, it was critical of trial counsel in several ways. For instance, it was critical of counsel's failure to: adequately prepare witnesses, undertake better efforts to get Aiken's testimony admitted, investigate Weisheit's alleged traumatic brain injuries and their effects, and object to testimony about the ultimate cause of the fire, among other things. However, despite these findings, the post-conviction court's conclusions of law were that there was no ineffective assistance of counsel.

We agree that counsel made errors and could have done things differently or better. Nevertheless, as discussed above, these errors do not rise to the level of deficient under *Strickland*. Further, even assuming counsel was deficient, Weisheit has not demonstrated prejudice. Indeed, he has not shown that he would be given a different sentence even if counsel had committed none of the alleged errors in light of the nature of this particular crime— the murder of two small children—and the overwhelming evidence of his guilt.

## B.   Appellate Counsel

### Counsel's failure to identify objectionable jurors on appeal

The standard for gauging appellate counsel's performance is the same as that for trial counsel. *Ward*, 969 N.E.2d at 75. "Claims of inadequate presentation of certain issues . . . are the most difficult for convicts to advance and reviewing tribunals to support." *Biegler v. State*, 690 N.E.2d 188, 195 (Ind. 1997). Here, Weisheit contends his appellate counsel performed deficiently "when he did not cite in the Brief of Appellant the clearest expression that Juror 7 would automatically vote for the death penalty." (Appellant's Br. at 71.)  That is, during voir dire, Juror 7 was presented with the following scenario:

> Murder of two children, eight and five, and an arson. No
> defenses, no mental illness that would excuse it, no retardation

that would excuse it, no drugs, no alcohol defenses that you would consider, just kind of stone cold-blooded killer of two innocent children. Is the death penalty the only appropriate penalty for that kind of guilty murder?

(Tr. 141.) And Juror 7 responded: "In that hypothetical situation, yes, I believe so." (Id.) Appellate counsel did not cite this portion of the transcript. Instead he quoted the following interaction between trial counsel and Juror 7:

> MR. McDANIEL: And I think in your – again, going back to the magic questionnaires here. You indicated you thought the death penalty was appropriate if it was premeditated, multiple murderer, particularly gruesome, and the victims suffered or were tortured. That would be, I think, what you wrote down.
>
> JUROR NO. 7: Yes, sir.
>
> MR. McDANIEL: And that would still be your opinion today; is that right?
>
> JUROR NO. 7: Yes, sir.
>
> MR. McDANIEL: And does that sound like the hypothetical facts that we were talking about here?
>
> JUROR NO. 7: Very similar, yes.
>
> MR. McDANIEL: All right. And I think that you indicated that you somewhat agree with eye for an eye. And even though that's a very common saying, let me ask what's that mean to you, the eye for the eye?
>
> JUROR NO. 7: Well, it means that if you take someone else's life, you shouldn't be allowed the privileges of continuing your own.

(Tr. 141-42.)

While Weisheit now prefers a different quotation than the one cited in his appellate brief, it is not clear that there is a significant difference between the two. In each passage, Juror 7 states a strong preference for the death penalty under facts like the one of this case. But the hypotheticals discussed by counsel during voir dire, are just that, hypotheticals. As discussed above, Juror 7 also stated during voir dire that the death penalty is not always the right thing to do and that such a sentence depends on the facts and circumstances of an individual case. Juror 7 was not presented with all the facts at the time the quoted statements were made.

Had appellate counsel not cited either quotation, perhaps we would be in a different situation. But as it stands, counsel provided significant relevant information about Juror 7's views that appears on the same page as the quote Weisheit prefers. In any case, this Court in reaching its decision is not limited to only what the parties discuss and cite in their briefs. Instead, we "review relevant portions of the record" thoroughly and "often decide cases based on legal arguments and reasoning not advanced by either party." *See Bieghler v. State*, 690 N.E.2d 188, 195 (Ind. 1997.) The language quoted by the parties is only the starting place for our review and decision-making. Thus, we cannot say that counsel was deficient for not choosing a particular quotation that appears on the same page of the transcript as language that was in fact quoted, nor can Weisheit claim prejudice as a result of counsel's decision to include different language in the brief. Accordingly, Weisheit's ineffective assistance of counsel claim as to his appellate counsel fails.

## Conclusion

While Weisheit's trial counsel made mistakes and could have done things better, counsel's performance was not deficient. In any case, Weisheit has not demonstrated that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

have been different.  Accordingly, Weisheit's ineffective assistance of trial counsel claims fail.

Weisheit's ineffective assistance of appellate counsel claim also fails because appellate counsel's performance was not deficient. Counsel made a reasonable decision to quote certain language from the transcript although it is not Weisheit's preferred quotation.  Further, given the similarities between the language chosen and the language not chosen and this Court's thorough review of relevant portions of the record, Weisheit has not demonstrated prejudice.

Finally, we note that in the post-conviction court's 81-page order, some of its findings seem to contradict its ultimate conclusions.  However, after an exhaustive review of the record and in light of our standard of review that requires us to affirm the post-conviction court unless there's no way within the law it could have come to the result it did (*Stevens*, 770 N.E.2d at 745), we believe the post-conviction court came to the right conclusion on all issues.  Thus, we affirm the post-conviction court.


Massa and Goff, JJ., concur.
Slaughter, J. concurs in part and in the judgment with separate opinion.
Rush, C.J. concurs in part and dissents in part with separate opinion.

ATTORNEYS FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kathleen Cleary
John Pinnow
Anne Murray Burgess
Deputy Public Defenders
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Kelly A. Loy
Tyler G. Banks
Deputy Attorneys General
Indianapolis, Indiana

**Slaughter, J., concurring in part and in the judgment.**

I agree with the Court that Weisheit is not entitled to post-conviction relief, and that the trial court's judgment upholding his convictions and death sentence should be affirmed. But I reach that result for different reasons. Unlike the Court, I conclude that trial counsel's performance during the penalty phase was deficient, but that Weisheit failed to show prejudice.

On the performance issue, I share the dissent's view that Weisheit's trial counsel were deficient during sentencing for all the reasons the Chief Justice outlines in her thoughtful and thorough opinion. Counsel's performance was indeed substandard and not the product of reasonable professional judgment or strategic choice in three respects: failure to pursue the Boys School records, failure to call Dr. Harvey about testifying for Weisheit, and failure to lay a proper foundation and make a clear offer of proof for Aiken's testimony.

On the issue of prejudice, the dissent concludes—and I agree—that none of counsel's "omissions, in isolation, is prejudicial enough to warrant relief". But where the dissent and I part company is the Chief Justice's view that Weisheit was prejudiced by counsel's **cumulative** deficiencies. She believes these deficiencies collectively undermine confidence in the legality of Weisheit's death sentence. I respectfully disagree. In my view, Weisheit did not sustain his burden under *Strickland*. He failed to show a "reasonable probability" that, had counsel performed competently, "the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).

The dissent correctly observes that the post-conviction court botched the governing legal standard under *Strickland*. Under the correct standard, Indiana's death-penalty statute required Weisheit to show a reasonable probability that, were it not for counsel's deficient performance during the penalty phase, at least one juror would not have voted for the death penalty, and the trial judge would not have imposed that sentence; or, alternatively, that the jury would have voted unanimously **not** to impose

the death penalty. This standard follows from our statute's mandate that a unanimous jury recommendation for or against death requires the trial judge to impose that sentence. Ind. Code § 35-50-2-9(e). And if even one juror disagrees, then the court alone decides the sentence. *Id*. § 35-50-2-9(f).

Based on this standard, the Chief Justice concludes that Weisheit is entitled to a new penalty phase. She finds that because *Strickland*'s prejudice inquiry depends on the balance of aggravators and mitigators, "adding enough weight to the mitigating side of the scale—or lifting enough weight from the aggravating side—makes all the difference." Although this proposition is true in the abstract, trial counsel's deficiencies here do not diminish Weisheit's aggravating circumstances; they affect only the mitigation side of the scale. While the omitted mitigating evidence in theory could have made a difference, Weisheit failed to show a reasonable probability on this record that the evidence would have made a difference—for two reasons. First, the aggravating evidence associated with Weisheit's multiple crimes was overwhelming. Second, the mitigating evidence trial counsel overlooked paled in comparison.

I'll begin with the overwhelming aggravating evidence supporting the death penalty. For two years Weisheit's girlfriend and her two young children had been living with him at his home in Evansville. After the girlfriend became pregnant, Weisheit reportedly doubted the unborn child was his. While the girlfriend was at work, Weisheit torched the house and left the two children in the house to die—eight-year-old Alyssa and five-year-old Caleb. Alyssa was found in a closet with over ninety percent of her body charred black. She either had been trapped inside the closet or had sought refuge there from the fire. The pathologist said she experienced a drowning-like sensation in her final moments. Caleb also was charred beyond recognition. He was found on a mattress in the bedroom, hog-tied with duct tape, with a washcloth stuffed in his mouth and secured by duct tape. A railroad flare had been placed in his underwear and another under his body. The flare in his underwear burned his left thigh while he was still alive and conscious. He died in

agony suffocating from soot and smoke inhalation. *See Weisheit v. State*, 26 N.E.3d 3, 6-8 (Ind.), *cert. denied*, 136 S. Ct. 901 (2015).

It is worth recounting some of these grisly aspects of Weisheit's crimes because they show how heavily the balance tipped in favor of the jury's unanimous recommendation to impose the death penalty and the high burden Weisheit faced on post-conviction review of proving that the omitted evidence stood a reasonable probability of changing that result. To be clear, someone who commits these or other monstrous acts does not forfeit his Sixth Amendment right to effective counsel. But the problem with Weisheit's ineffectiveness claim is that the circumstances surrounding the proven statutory aggravators were heinous. In a less-horrific case, perhaps the same omitted evidence would have tipped the scales and led to a sentence other than death. But here Weisheit failed to establish that the omitted evidence probably would have made a difference.

That is especially true because the omitted evidence was partially cumulative of other evidence the jury already heard and was only partially mitigating. As the Court points out, the jury heard a "rather complete picture of Weisheit's mental health at trial", including his significant history of mental-health problems, his suicide attempts, and his possible manic episode while carrying out the two murders. The Boys School records would have provided some additional detail of the extent of Weisheit's mental-health problems and his troubled childhood. And had Dr. Harvey testified, the jury would have heard his firsthand account of Weisheit's bipolar disorder during a manic phase. But Weisheit did not establish that this limited additional mitigating evidence, on top of what the jury already heard, probably would have persuaded at least one juror and the trial judge (or, alternatively, **all** the jurors) to spare his life.

In addition, the overlooked evidence was not uniformly mitigating. The school records, for example, included multiple references to Weisheit's lack of remorse after his prior crimes and his cruelty to animals over the years. Also of dubious mitigating value was Aiken's proposed testimony that Weisheit could have adjusted to prison life and would not pose a danger to others if he were incarcerated and not executed. There was

ample countervailing evidence that Weisheit was a troublemaker who would pose a danger to others within the prison setting. As the Court emphasizes, Weisheit's prison records revealed a propensity for violence and antisocial behavior, including threats to kill an EMT who was dispensing medication; threatening correctional officials and other inmates; hiding sharp chicken bones in his mouth during a search; and urinating in a hallway.

Weisheit's guilt is clear, and so is the horrific nature of his crimes. He didn't just kill these young children; he left them to die in a house fire he started, and he ensured they would suffer unimaginable pain before succumbing. As we held on direct appeal, the State proved the existence of aggravating circumstances beyond a reasonable doubt, and the jury was entitled to conclude the aggravating circumstances outweighed the mitigating circumstances. 26 N.E.3d at 20. The fact that trial counsel should have presented some additional mitigating evidence at Weisheit's penalty phase does not establish a reasonable probability on this record that the outcome would have been different if they had. For these reasons, I agree that trial counsel were not constitutionally ineffective during the penalty phase. The post-conviction court was right to deny Weisheit relief. I join the Court's opinion affirming his convictions, and I concur in its judgment affirming his sentence.

**Rush, C.J., concurring in part and dissenting in part.**

There is no question that the murders of Alyssa and Caleb were unequivocally horrific. And Weisheit's guilt for those disturbingly reprehensible crimes is clear. I thus agree with my colleagues that Weisheit has no right to a new trial on his guilt. His convictions should stand.

I also agree that Weisheit's many claims of ineffective assistance at the penalty phase of trial fail individually. But in my view, Weisheit has met his burden on his cumulative-effect claim.

"[D]eath is different," *Ring v. Arizona*, 536 U.S. 584, 606 (2002), and the "qualitative difference between death and other penalties calls for a greater degree of reliability when the death sentence is imposed," *Lowenfield v. Phelps*, 484 U.S. 231, 238–39 (1988) (quoting *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion)). *See Monge v. California*, 524 U.S. 721, 732 (1998). Here, the evidence and the post-conviction court's findings compel the conclusion that counsel's penalty-phase performance suffered multiple deficiencies. While none of those deficiencies, in isolation, is prejudicial enough to warrant relief, in the aggregate, they deprived the jury of enough essential information about Weisheit's background and mental health that his death sentence is not as reliable as the constitution requires.

"[T]here are certain immutable principles of justice which inhere in the very idea of free government which no member of the Union may disregard." *Powell v. Alabama*, 287 U.S. 45, 71–72 (1932) (quoting *Holden v. Hardy*, 169 U.S. 366, 389 (1898)). Among them is the constitutional right to due process, which secures another constitutional right: to effective assistance of counsel. *Id.; see Strickland v. Washington*, 466 U.S. 668, 684–85 (1984).

To uphold these constitutional pillars of justice, when a defendant's life is at stake—no matter how reprehensible the defendant—there is "an acute need for reliability," *Monge*, 524 U.S. at 732, which calls courts to be

"particularly sensitive to insure that every safeguard is observed," *Gregg v. Georgia*, 428 U.S. 153, 187 (1976) (plurality opinion). This includes verifying that the jury was properly presented with mitigating evidence to consider at the sentencing phase. *See Williams v. Taylor*, 529 U.S. 362, 395–98 (2000); *Eddings v. Oklahoma*, 455 U.S. 104, 116–17 (1982).

We conduct this review with "painstaking care," *Burger v. Kemp*, 483 U.S. 776, 785 (1987), in part because the death penalty is "profoundly different from all other penalties," *Eddings*, 455 U.S. at 110 (quoting *Lockett*, 438 U.S. at 605 (plurality opinion)), and "unique 'in both its severity and its finality,'" *Monge*, 524 U.S. at 732 (quoting *Gardner v. Florida*, 430 U.S. 349, 357 (1977) (plurality opinion)). Our careful review is to confirm that the state's imposition of the death penalty stands soundly on the fundamental principles of justice that our federal constitution guarantees. An execution tainted by constitutional error corrodes the integrity of the justice system and of the state that imposed it. I believe Weisheit's death sentence suffers that taint of constitutional error.

It is entirely possible that without counsel's performance deficiencies Weisheit would still have received a death sentence—again, these murders were brutal. But there is also a reasonable probability that he wouldn't have. So the outcome of his penalty phase does not meet the required level of reliability. *See Strickland*, 466 U.S. at 694. Weisheit was thus denied his Sixth Amendment right to effective assistance at the penalty phase—though not at the guilt phase—of trial.

The post-conviction court reached the opposite conclusion and relied on improper legal standards. For these reasons, I would remand for a new penalty phase untainted by constitutional error before this case undergoes further review. *Cf. Baer v. Neal*, 879 F.3d 769, 773 (7th Cir. 2018) (finding that this Court unreasonably applied *Strickland* in denying the defendant relief on claims of ineffective assistance at the penalty phase of trial), *petition for cert. filed*, (U.S. Aug. 31, 2018) (No. 18-287).

I therefore respectfully dissent in part.

# I. The evidence and the post-conviction court's findings contradict its cumulative-effect conclusion.

It is true that Weisheit must convince this Court that there is no way within the law that the post-conviction court could have arrived at the conclusion it did. *See Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002). And "[s]urmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

But the bar is not unreachable. The post-conviction court here was required to "make specific findings of fact, and conclusions of law on all issues presented." Ind. Post–Conviction Rule 1(6). Under this requirement, the evidence must support the findings, and the findings must support the conclusions. *Bivins v. State*, 735 N.E.2d 1116, 1121 (Ind. 2000). We do not defer to the court's legal conclusions, but we do defer to its factual determinations, reviewing them only for clear error. *See, e.g.*, *Wilkes v. State*, 984 N.E.2d 1236, 1240 (Ind. 2013).

The post-conviction court's findings[1] and the evidence as a whole lead only to the conclusion that counsel's deficiencies collectively prejudiced

---

[1] I agree with my colleagues that these findings are, in fact, the court's findings. The State at oral argument asserted that the order's numbered paragraphs are merely paraphrased restatements of Weisheit's arguments, but the post-conviction court explicitly foreclosed that interpretation in its order's introduction:

> To the extent that any part of these findings of fact and conclusions of law appear to have been adopted from a party's proposed findings of fact and conclusions of law, the Court represents that such has been reviewed by the Court and constitutes the Court's own finding[s] or conclusions.

Although some of the court's findings do observe Weisheit's arguments—with sentences starting "Weisheit alleges . . ." or "Weisheit claims . . ."—nothing indicates that those qualifiers extend beyond the sentences they begin. Nor is this a case in which the court essentially adopted wholesale and verbatim Weisheit's allegations as the court's findings of fact and conclusions of law. Even if the court had done so, we would take the findings and conclusions as the court's own while approaching them with cautious appellate scrutiny. *See Stevens*, 770 N.E.2d at 762.

Weisheit at the penalty stage. The post-conviction court erred in concluding otherwise.

I'll begin with counsel's performance deficiencies and then turn to their cumulative effect.

## A. Multiple deficiencies marred counsel's penalty-phase performance.

The Sixth Amendment guarantees Weisheit "the Assistance of Counsel," U.S. Const. amend. VI, which carries a performance standard of "reasonableness under prevailing professional norms," *Strickland*, 466 U.S. at 688.

In measuring attorney performance, courts are mindful that counsel's function is to make the adversarial testing process work in each case. *Id.* at 688–90. In death penalty cases, counsel should make "extraordinary efforts on behalf of the accused," whose life is at stake. *Woolley v. Rednour*, 702 F.3d 411, 425 (7th Cir. 2012) (quoting *ABA Standards for Criminal Justice Prosecution Function and Def. Function* 120 (3d ed. 1993) [hereinafter *ABA Standards*]); *ABA Guidelines for the Appointment and Performance of Def. Counsel in Death Penalty Cases*, Introduction (2003) [hereinafter *ABA Guidelines*].[2] At the sentencing phase, "defense counsel's job is to counter the State's evidence of aggravated culpability with evidence in mitigation." *Rompilla v. Beard*, 545 U.S. 374, 380–81 (2005).

Since during the penalty phase Weisheit's counsel acknowledged Weisheit's guilt and presented a case in mitigation, counsel had "every reason to develop the most powerful mitigation case possible." *Wiggins v. Smith*, 539 U.S. 510, 526 (2003). Counsel's obligation to find mitigating evidence included conducting "a thorough investigation" of Weisheit's

---

[2] The Supreme Court of the United States has "long referred" to American Bar Association standards and guidelines "as guides to determining what is reasonable." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (quoting *Strickland*, 466 U.S. at 688). I likewise refer to them not as setting out rigid, detailed rules but as guideposts for determining reasonableness under professional norms at the time counsel represented Weisheit.

background. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) (quoting *Williams*, 529 U.S. at 396). Interviewing witnesses and requesting records were the first steps. *Id.* Then counsel should have left "no stone unturned," *ABA Standards* at 4-1.2 Commentary, "to discover **all reasonably available** mitigating evidence," *Wiggins*, 539 U.S. at 524 (quoting *ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 11.4.1(C) (1989)). *See also ABA Standards* at 4-4.1(a) ("Defense counsel should . . . explore all avenues leading to facts relevant to the merits of the case and the penalty . . . .").

Limitations on the investigation must be supported by "reasonable professional judgments" under the circumstances; they must not result from inattention. *Wiggins*, 539 U.S. at 533 (quoting *Strickland*, 466 U.S. at 691). *Compare Bobby v. Van Hook*, 558 U.S. 4, 11–13 (2009) (per curiam), *with Williams*, 529 U.S. at 395–96. Presenting some mitigating evidence is not enough if counsel failed to pursue sources that counsel should have been aware of, that were reasonably available, and that promised more powerful evidence than counsel actually obtained. *See Wiggins*, 539 U.S. at 533; *Porter*, 558 U.S. at 39–40; *Rompilla*, 545 U.S. at 381–90. Finally, greater effort is required when the absent evidence is "particularly pressing" for the defendant's case. *Rompilla*, 545 U.S. at 386. In other words, the amount of effort that is reasonable rises with the evidence's importance.

In Weisheit's case, counsel countered the aggravating circumstances— two murders of children under the age of twelve, *see* Ind. Code § 35-50-2-9(b)(8), (12) (2008)—with four statutory mitigating factors. First, Weisheit had no significant history of prior criminal conduct. *See* I.C. § 35-50-2-9(c)(1). Second, Weisheit was under the influence of extreme mental or emotional disturbance when he committed the murders. *See* I.C. § 35-50-2-9(c)(2). Third, Weisheit's capacity to appreciate the criminality of his conduct or to conform that conduct to the law was substantially impaired

because of mental disease or defect.[3] *See* I.C. § 35-50-2-9(c)(6). And finally—in a catchall for any other circumstances appropriate for consideration—Weisheit could be securely housed in the Department of Correction for the remainder of his life, and his troubled childhood and mental health issues reduce his culpability. *See* I.C. § 35-50-2-9(c)(8); *Porter*, 558 U.S. at 43–44; *Rompilla*, 545 U.S. at 390–91; *Williams*, 529 U.S. at 395–96; *Skipper v. South Carolina*, 476 U.S. 1, 4–5 (1985).

Within this framework, counsel's penalty-phase performance suffered multiple deficiencies: failure to ask Dr. Philip Harvey if he would testify; failure to pursue the Boys School records; and—for Aiken's testimony—failure to point the trial court to the proper foundational requirements and to make an adequate offer of proof.

### 1. Failure to ask Dr. Harvey if he would testify, after receiving an email from him indicating he could testify about his past evaluation of Weisheit.

Defense counsel did not attempt to secure Dr. Harvey as a witness for the penalty phase of trial. As the post-conviction court found, Dr. Harvey was an expert on bipolar disorder who personally observed Weisheit exhibit signs of a manic episode during an in-person evaluation. He emailed the defense team that, while he was unable to perform a future assessment of Weisheit, he was able and willing to testify about his past observations of Weisheit. After receiving this email and despite Dr. Harvey's willingness, Weisheit's counsel never contacted the doctor to see

---

[3] This statutory mitigating factor differs from the insanity defense. Whereas insanity is a defense when the defendant, "as a result of mental disease or defect . . . was **unable** to appreciate the wrongfulness of the conduct at the time of the offense," I.C. § 35-41-3-6(a) (emphasis added), the statutory mitigating factor applies when the defendant's "**capacity to appreciate** the criminality of the defendant's conduct **or to conform** that conduct to the requirements of law was **substantially impaired** as a result of mental disease or defect or of intoxication," I.C. § 35-50-2-9(c)(6) (emphases added). Because of these differences, a person may be legally sane but nevertheless qualify for the mitigating factor, depending on the degree of the defendant's mental illness. *See, e.g.*, *Matheney v. State*, 688 N.E.2d 883, 898 (Ind. 1997); *Lowery v. State*, 547 N.E.2d 1046, 1059 (Ind. 1989).

if he would testify. The post-conviction court—after taking evidence—properly found that this failure was a "mistake" and "not a strategic decision," yet concluded that trial counsel's performance was not deficient. As I explain below, the post-conviction court's findings and the evidence as a whole do not support this conclusion.

### a. The evidence supports the post-conviction court's findings that counsel's communication failure was a "mistake" and "not a strategic decision," so we are bound by them.

At the post-conviction hearing, Dr. Harvey testified about his extensive background studying bipolar disorder since 1979, including a clinical research study involving more than 4,500 people with bipolar disorder. Dr. Harvey then explained his involvement with Weisheit's case, beginning with lead counsel Tim Dodd contacting him:

> . . . [Dodd] had me go to Evansville and perform an evaluation. Our plan was to perform an initial mental health evaluation . . . [t]o be followed up by other assessments as needed. . . .
>
> . . . What was clear when I was talking to Mr. Weisheit was that he was showing the signs of having a manic episode. . . .
>
> . . . This interview was performed on the 19th of September, 2010.
>
> . . . [T]hen Mr. Dodd showed me a video that had been taken at the time of Mr. Weisheit's arrest . . . .
>
> . . . Mr. Weisheit was very agitated when he got out of the car. He was yelling at the officers that were there. He threw – he actually threw a knife at the officers immediately prior to being struck by the taser.

Following this meeting, in May 2011, Dodd sent Dr. Harvey a letter, forecasting Dr. Harvey's further involvement with the case and telling him to expect some health records on Weisheit's family members. But Dodd died the following month. Dr. Harvey wanted to do at least one repeat examination, and Weisheit's "second chair" counsel, Stephen Owens, testified that he was aware of that fact. Nevertheless, after receiving the records Dodd had mentioned in his letter, Dr. Harvey "never received a repeat invite to come back and see Mr. Weisheit after that for a considerable period of time."

Then, in January of 2012, Dr. Harvey sent an email to the mitigation specialist, Mike Dennis. Dr. Harvey testified that he had sent the email "based on my being informed by my medical group that effective the 1st of January, 2012 we could no longer be paid for doing personal assessments on individuals." He also testified that in the email, "I told him . . . I'd be happy to help you find someone else to perform an assessment on Mr. Weisheit, but I also made it very clear in [the email that] this does not preclude testimony on previously seen cases. . . . I will have to restrict my testimony to the data that I have previously collected prior to this rule."

Dr. Harvey's email matches his testimony. It was dated January 17, 2012, and provided,

> We have just been informed that as of the first of this year, we can no longer be paid as individuals for the assessment of any forensic cases that involve direct contact with clients. . . . This does not preclude testimony on previously seen cases. Let me try to find you someone else who could do an assessment for you, but I can't. I will have to restrict my testimony to the data that I previously collected prior to this rule.

Dr. Harvey testified about what happened next:

> . . . Then I discovered in 2012 that Mr. Weisheit's initial counsel had died. And I wrote a summary of my assessment and provided it at that point in 2012 to the mitigation specialist.

. . . .

> . . . It was a very abbreviated report just summarizing the
> results of my three hour – two and half, three hour visit with
> Mr. Weisheit and some of the minimal medical records that I've
> been sent since then . . . .

Dr. Harvey explained that he could have testified at Weisheit's trial in
2013, but that he was not asked by counsel to do so and in fact "heard
nothing else about this proceeding." He also testified that "[b]ipolar
disorder would meet the criteria for extreme emotional disturbance," a
mitigating factor under Indiana Code section 35-50-2-9(c)(2), and that
"[c]learly if someone was experiencing a major depressive or manic
episode at the time of committing the crime it would meet th[e] criteria"
for the mitigating factor under Section 35-50-2-9(c)(6) (substantial
impairment from mental disease or defect).

Counsel Owens testified at the post-conviction hearing that "[i]nitially
the lead counsel was Tim Dodd. Tim came in in April of 2010 and then he
passed in June of 2011," and Mike McDaniel, who replaced Dodd, died
before the post-conviction hearing. Owens explained the attorneys'
involvement in the mitigation aspect of the case:

> I think initially when Tim was in the case, Tim was having
> more contact with Mike [Dennis, the mitigation investigator]
> than I was. Sort of gave Mike the job of going out and locating
> as much mitigation evidence and witnesses as we could. So, I
> don't think either one of us, either Tim or I, had much input
> into the mitigation at that point. When Mike McDaniel came
> into the case, we pretty much left it up to Mike and Dennis.

When asked if Owens considered contacting Dr. Harvey at the time of
trial to see if he was available as a potential mitigation witness, Owens
responded,

> I had received information from Mike Dennis and Mike
> McDaniel that Dr. Harvey was no longer able to participate. . . .

My understanding was, basically, he was not going to be able
to be a witness and he was not going to be able to continue to
evaluate.

. . . .

. . . [O]ur understanding was th[at] Dr. Harvey was not going
to be able to continue as an expert, because his employment
had changed and he was not going to be able to return to
Indiana. . . . We moved to continue th[e] trial date as a result of
Dr. Harvey sort of bailing out on us and that we needed
some[]time to obtain an expert witness.

Owens confirmed that neither he nor Mike McDaniel contacted Dr.
Harvey when the trial came in 2013, to see if he was available to testify.

After weighing this evidence, the post-conviction court's findings for
counsel's failure to contact Dr. Harvey included the following:

3. Dr. Harvey is a licensed psychologist. . . . Dr. Harvey has been studying
   Bipolar Disorder since 1979.

4. Dr. Harvey was involved in a very large and significant study of veterans
   diagnosed with Bipolar Disorder as the Clinical Chair. . . . Dr. Harvey
   personally reviewed [thousands of] individual results in the study.

   . . . .

6. Dr. Harvey testified to the importance of a clinical interview. . . . Dr.
   Harvey finds a structured interview like the SCID is the most informative
   aspect of a clinical evaluation. . . .

7. Dr. Harvey was originally contacted by prior counsel, Timothy Dodd. Dr.
   Harvey performed an evaluation of Weisheit on September 19, 2010. . . .
   During the evaluation, Dr. Harvey administered the SCID. Dr. Harvey felt
   Weisheit was showing signs of a manic episode when he performed
   Weisheit's evaluation. Following the evaluation, Dr. Harvey met with trial
   counsel and . . . [c]ounsel showed Dr. Harvey the video of Weisheit being
   stopped [by police] and his behavior prior to being hit with a taser. Dr.
   Harvey informed trial counsel Weisheit's behavior was consistent with the
   behavior he observed when he performed the evaluation of Weisheit. At
   the time, Dr. Harvey expected he would perform another psychological

evaluation [of Weisheit]. He was provided the family mental health records in 2011, but had no other contact with the trial team regarding the additional evaluation until January of 2012. In an e-mail to the defense team, Dr. Harvey notified them of his recent change of conditions of employment. . . . [H]e [could] no longer have direct contact with individuals in forensic cases. . . . He would have to restrict his testimony to the evaluation he had performed. . . . He could have testified at the 2013 trial, but was not asked to do so.

. . . .

11. The failure to call Dr. Harvey was not a strategic decision. Counsel mistakenly believed Dr. Harvey was not able to continue on the case. The e-mail contradicts this belief . . . . Dr. Harvey clearly conveyed he was available to testify to the results obtained during his evaluation of Weisheit. Counsel did not contact Dr. Harvey to learn whether he could or could not testify. Dr. Harvey was willing to do so. Due to counsel's mistake, Dr. Harvey was not provided the necessary documentation of evidence supporting the episodic nature of Bipolar Disorder and the Boys School records reflecting the long term treatment for Major Depression. A Major Depressive Episode is the first observed symptom for the majority of those identified later in life with Bipolar Disorder. Weisheit's presentation, a late onset single manic episode, is consistent with 40% of those diagnosed with Bipolar Disorder.

12. Dr. Price's testimony reflected some of Dr. Harvey's observations. However, he could not testify to Dr. Harvey's opinion and therefore had to dilute the information collected by Dr. Harvey . . . .

13. Dr. Harvey's testimony could have been used to rebut the State's expert, Dr. Allen. . . .

14. . . . Dr. Harvey's opinion would have supported two statutory mitigators and would have effectively rebutted Dr. Allen's testimony. The State exploited counsel's failure and argued there was no evidence of these two statutory mitigators (Tr. 2568-2569). By failing to contact Dr. Harvey, the defense was left with one expert to testify to the cognitive disorder and Bipolar Disorder. Trial counsel's own assessment of the credibility of Dr. Price's testimony reflects the magnitude of this error.

Ultimately, the evidence supports the post-conviction court's findings. Dr. Harvey made clear in his email that he was able to testify to his previously collected data. That data was critical to Weisheit's mitigation case, which largely relied on the effect of Weisheit's mental health on his behavior and culpability.

Although the email clearly informed counsel that Dr. Harvey could testify to his past evaluation, if the email had created any doubt about his ability to testify, diligence would have required a phone call or some other contact for clarification. *See generally* Ind. Professional Conduct Rule 1.3 (requiring "reasonable diligence"). Instead, counsel did nothing.

 Failing to contact Dr. Harvey after he emailed the defense team "resulted from inattention, not reasoned strategic judgment." *Wiggins*, 539 U.S. at 526; *see Strickland*, 466 U.S. at 689. So the post-conviction court properly found that "not contact[ing] Dr. Harvey to learn whether he could or could not testify" was a "mistake" and "not a strategic decision." It was also not a minor, innocuous mistake, *see Strickland*, 466 U.S. at 695–96; *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001), because Dr. Harvey's hours-long, in-person encounter with Weisheit was vitally important to the defense's case. As the post-conviction court found, "[t]he State exploited counsel's failure" by arguing that no evidence showed the two statutory mitigators that "Dr. Harvey's opinion would have supported," revealing a breakdown in the adversarial process, *see Strickland*, 466 U.S. at 688–90. Given the evidence in support, these and other related findings were not clearly erroneous.

### b. The evidence and the post-conviction court's findings, however, do not support its conclusion that trial counsel was not deficient.

Although the post-conviction court's findings are supported by the evidence, neither those findings nor the evidence as a whole support its conclusion that "Weisheit has failed to show that trial counsel['s] performance fell below prevailing professional norms where counsel failed to call Dr. Philip Harvey at the penalty phase of Weisheit's trial."

The court reasoned that "Weisheit never established when the [new employment rule] . . . went into effect" and "[i]t was reasonable for trial counsel to decide to hire another qualified expert." This reasoning—and the conclusion that stands on it—is faulty, for multiple reasons.

First, as the post-conviction court found, Dr. Harvey's email—dated January 17, 2012—specified that the rule went into effect "as of the first of this year." So Weisheit did establish when the rule went into effect. Even more importantly, though, Weisheit did not need to establish the rule's effectuation date. This is because the rule did not bar Dr. Harvey from testifying to his past evaluation of Weisheit. As the post-conviction court found, "Dr. Harvey clearly conveyed he was available to testify to the results obtained during his evaluation of Weisheit."

Second, the post-conviction court—and similarly the majority today—excuses counsel for dropping Dr. Harvey's involvement because counsel later hired Dr. Price, who incorporated Dr. Harvey's two-page summary memorandum into his own assessment and testimony. But hiring Dr. Price does not erase the deficiency from counsel's performance. This is because the choice to employ Dr. Price was based entirely on counsel's false impression that Dr. Harvey could not testify—a false impression formed by inattention rather than by "reasoned strategic judgment." *Wiggins*, 539 U.S. at 526. Thus, although calling Dr. Price to testify may have been a reasonable decision by itself, it proceeded from inattention that did not reflect reasonable professional judgment. *Cf. id.* at 533 ("'[S]trategic choices made after less than complete investigation are reasonable' only to the extent that 'reasonable professional judgments support the limitations on investigation.'" (quoting *Strickland*, 466 U.S. at 690–91)).

And although hiring Dr. Price might have shielded Weisheit from prejudice caused by counsel's deficient performance, that goes to *Strickland*'s second prong. *See Timberlake*, 753 N.E.2d at 603 ("The two prongs of the *Strickland* test are separate and independent inquiries."). Regardless of prejudice, the post-conviction court's findings and the evidence as a whole lead only to the conclusion that failing to contact Dr. Harvey after he emailed the defense team was an inexcusable,

unprofessional error—one that amounted to deficient performance under *Strickland*'s first prong. *See Williams*, 529 U.S. at 396 (chiding counsel for failing to return a phone call of someone who had visited the defendant in prison and had offered to testify); *Hall v. Washington*, 106 F.3d 742, 749–50 (7th Cir. 1997). The post-conviction court's opposite conclusion—that counsel was not deficient—is thus contrary to law.

## 2. Failure to pursue the Boys School records.

Early in their investigation, defense counsel learned that records of Weisheit's time at the Boys School likely contained valuable mitigating evidence. Counsel were aware that while Weisheit was at the Boys School, he attempted suicide and received treatment at Methodist Hospital. Tim Dodd accordingly sent initial records requests to the Department of Correction and to the hospital, but neither entity could fill the request.

Despite both the importance of the records to Weisheit's case and the Department's invitation to contact its Director of Operational Support, defense counsel made no other efforts to find the Boys School records. Post-conviction counsel obtained the records from the state archives, which had received the records from the Boys School "in accordance with the records retention schedule for the Indiana Department of Correction."

After reviewing the evidence, the post-conviction court rightly found that the mitigation case would have been stronger "but for counsel's deficiencies," and even likened counsel's limited investigation to the deficient performance found in *Wiggins*, 539 U.S. at 525. Yet the post-conviction court concluded that counsel's aborted efforts were not deficient performance. The court's findings and the evidence as a whole do not support this conclusion.

### a. The evidence supports, so we are bound by, the post-conviction court's findings that counsel's limited investigation amounted to "deficiencies" that weakened the defense's case in mitigation.

Counsel had limited records indicating that Weisheit attempted suicide while at the Boys School and received treatment at Methodist Hospital. Those records did not provide specific details about the suicide attempt or Weisheit's behavior and health at that time. With this important documentation missing, Dodd sent initial records requests to the hospital and to the Department of Correction. His letter to the Department said,

> It is our understanding that [Weisheit] was a[n] inmate at the Indiana Boys School. The enclosed Subpoena is issued in order to obtain such records you may have concerning his incarceration, in 1992-1993. We believe he attempted suicide while at Boy's School and was taken to Methodist Hospital where he spent 5-6 weeks. We hope your file contains records from that Methodist Hospital stay and if so the subpoena is intended to include those records. Our subpoena to Methodist Hospital was returned by them indicating their files had been purged.

The Department responded that "we have no match" for the requested records and that "[a]fter 10 years if an offender doesn't return to our facility we destroy the file." The Department's letter also gave the name and phone number of the Director of Operational Support and invited, "please feel free to contact" that person with "[a]ny further questions."

At the post-conviction hearing, Mike Dennis testified about the defense team's efforts to obtain the records:

> After we knew that [Weisheit] had been in the Boy[s] School Tim and I talked about it and I said – I don't think I initially called them. I said we ought to just write a letter, send a release and he did that. At some point several weeks later, I'm not sure

how long, he received a letter back saying that the records were unavailable.

When asked about follow-up efforts, Dennis revealed that there were none:

Q   And to your knowledge, were any other efforts made to seek those records?

A   Not to my knowledge.

    . . . .

Q   Mr. Dodd never asked you to do anything else to get those records?

A   No.

Q   And Mr. McDaniel, he did not ask you to do anything to get those records?

A   No.

Q   And Mr. Owens, did he ask you to do anything to get those records?

A   No.

Dennis also testified that he knew of the Indiana State Archives. But, as Owens testified, no one from the defense team went to the state archives to attempt to obtain the Boys School records.

Weisheit's post-conviction counsel retrieved the Boys School records from the state archives. The custodian of those records confirmed that "[t]he records, consisting of 403 pages, were received from the Indiana Boys School in accordance with the records retention schedule for the Indiana Department of Correction (Record Series 86-368)," and supplied the records retention policy. The policy provides that before the Department of Correction destroys an offender packet "ten (10) years after discharge, expiration of the sentence[,] or closing of the Department's interest in the case," the records are first transferred "to the designated

departmental collection center" and must undergo "SAMPLING by the STATE ARCHIVES DIVISION, ARCHIVES AND RECORDS ADMINISTRATION."

After being presented with this evidence, the post-conviction court made findings on counsel's limited investigation, including the following:

2. Mike Dennis was the defense team's mitigation investigator. Owens testified the mitigation aspect of the case was "pretty much left to Mike Dennis."

3. The defense team was aware Weisheit had spent some time in the Boys School. Tim Dodd sent a letter to the Department of Correction requesting copies of the Boys School records. Dodd received a response that they no longer had the records (PCR Ex. C). Dennis was never asked by any other counsel to do anything else to look for the Boys School records. They received a few records from Weisheit's parents, but did not get everything they wanted.

4. The defense team was aware that while Weisheit was at the Boys School, he was sent to Methodist Hospital. A report from the Boys School . . . indicated that while Weisheit was in the psychiatric unit of Methodist Hospital after attempting suicide at the Boys School, he suffered a psychotic break (PCR Ex. 5). Owens testified if there was evidence Weisheit had a psychotic break while at Methodist Hospital, that would have been important to provide to the defense team's experts.

. . . .

13. . . . [H]ad counsel been armed with the Boys School records, he would have been able to present to the jury information about the school's resources and the rarity of Weisheit's placement at Methodist. [Deborah Eccles-]Skidmore could have been a much more compelling witness for the defense but for counsel's deficiencies.

Under a "conclusion" heading, the post-conviction court's order included additional findings on counsel's limited investigation and likened those findings to the deficient performance in *Wiggins*:

> The investigation the defense team conducted unearthed leads to persuasive mitigating evidence. They knew that Weisheit was in the Boys School yet failed to find the records. . . . The records that were provided to

the jury reflected very little of the compelling evidence of Weisheit's mental illness or the role his family played in failing to follow through with treatment. . . . The Boys School records document lengthy treatment for a major mental illness, one which included that Weisheit suffered a psychotic break. . . . In *Wiggins*, the Supreme Court found counsel's performance deficient where they failed to continue investigating once this type of lead had been found. "The scope of the[ir] investigation was also unreasonable in light of what counsel actually discovered [in the . . . records]." *Wiggins*, 539 U.S. at 525. The Court explained counsel uncovered no evidence to suggest "further investigation would have been fruitless." *Id.*

Ultimately, the evidence supports the post-conviction court's findings. Indeed, counsel was aware that the Boys School records promised persuasive mitigating evidence of Weisheit's troubled youth and mental health issues. Counsel also had no reasonable substitute for the Boys School records, making those records of Weisheit's time at the Boys School—when he attempted suicide—particularly pressing for the strength of the defense's case. *See Rompilla*, 545 U.S. at 385–86.

With Weisheit's life on the line, and considering the records' importance to the mitigation case, reasonable efforts certainly required at least **some** follow-up action. This is especially true since the Department of Correction invited counsel to contact the Director of Operational Support for more information, and counsel did not even take that small step. In light of the evidence, the post-conviction court's findings about the defense team discontinuing their investigation of the Boys School records after "unearth[ing] leads to persuasive mitigating evidence" are not clearly erroneous.

### b. The evidence and the post-conviction court's findings do not support its conclusion that counsel's limited investigation was not deficient performance.

Although the evidence supports the findings above, those findings and the evidence do not support the court's conclusion that "[t]rial counsel's

efforts to gain information regarding Weisheit's Indiana Boys' School records was more than sufficient under the dictates of *Strickland*."

For this conclusion, the post-conviction court reasoned that counsel "was informed that the records did not exist and that the documents were older than their retention policy." It further reasoned that "[h]ad IDOC referred trial counsel to the State Archives and trial counsel failed to exhaust this lead, Weisheit would have had a much closer case for deficiency." This reasoning is inaccurate and ignores counsel's failure to take the step that the Department **did** set out for counsel.

The Department's letter did not make the broad statement that the records did not exist. Rather, it informed counsel that the Department did not have the file, and it recited part of their record-retention practices. Specifically, it explained that they had "no match" for the requested records and possessed only an offender card on Weisheit, and that "[a]fter 10 years if an offender doesn't return to our facility we destroy the file."

The Department invited counsel's further questions, and counsel failed to act on that invitation. It was not the Department's responsibility to provide counsel with other next steps for their investigation, such as referring counsel to the state archives. It was counsel's responsibility to follow the leads that they had and to be thorough in uncovering the defendant's background. *See Porter*, 558 U.S. at 39–40; *ABA Supplementary Guidelines for the Mitigation Function of Def. Teams in Death Penalty Cases*, Introduction, 10.4 (2008) (recognizing that the "ultimate responsibility for the investigation . . . rests irrevocably with counsel").

As the post-conviction court observed in comparing this case to *Wiggins*, the evidence does not suggest that it would have been fruitless to contact the Department's Director of Operational Support for more information about what happened to the records. Quite the opposite: counsel might have learned that destruction-after-ten-years was not the entirety of the Department's record-retention policy. The policy included in the post-conviction evidence called for destruction of offender files ten years after "discharge, expiration of the sentence[,] or closing of the Department's interest in the case," but only after the records are

transferred and undergo "SAMPLING by the STATE ARCHIVES DIVISION, ARCHIVES AND RECORDS ADMINISTRATION."

Similar to the post-conviction court, the majority asserts that "it does not seem that counsel was deficient"[4] for discontinuing pursuit of the Boys School records because "counsel was told by the Boys School that there was no match for the records and that records over 10 years old were destroyed, and counsel did obtain other mental health records from other sources."

True, this is not a case where counsel completely ignored their obligation to find mitigating evidence. *See Rompilla*, 545 U.S. at 381. Counsel did obtain some records. But those records made counsel aware that the Boys School records promised more powerful mitigating evidence, and counsel had an obligation to follow that lead. *See Porter*, 558 U.S. at 39–40; *Rompilla*, 545 U.S. at 381–89; *Wiggins*, 539 U.S. at 533–34. Counsel didn't need to "scour the globe" for the Boys School records. *Rompilla*, 545 U.S. at 383. But counsel's aborted pursuit of critical mitigating evidence is a far cry from both counsel's "overriding mission of vigorous advocacy," *Strickland*, 466 U.S. at 689 and the "extraordinary efforts" demanded when a client's life is at stake, *ABA Guidelines*, Introduction. Particularly because counsel knew the importance of Weisheit's mental-health history to his mitigation case, doing nothing to follow up on the records was unreasonable.

Augmenting the unreasonableness of counsel's inaction are that the sentencing phase was "the main event" of Weisheit's trial since acquittal was unlikely, *Brewer v. Aiken*, 935 F.2d 850, 860 (7th Cir. 1991) (Easterbrook, J., concurring), and that reasonable efforts would have been enough to locate and obtain the records at the state archives, *see Rompilla*, 545 U.S. at 389–90. Counsel's inaction and lack of effort in pursuing

---

[4] Whether the majority has imposed a heightened burden on Weisheit—to show **clearly** ineffective assistance—is another issue. Weisheit bears the burden of establishing grounds for relief by a preponderance of the evidence. *See* P–C.R. 1(5); *Wilkes*, 984 N.E.2d at 1240. In my view, Weisheit has carried his burden to establish deficient performance and cumulative prejudice.

valuable mitigating evidence was unreasonable and put their client's life at greater risk. *Cf. Baer*, 879 F.3d at 783–84. These failures amounted to deficient performance.

### 3. Failure to identify proper foundational requirements and to make a clear offer of proof for Aiken's testimony.

Laying a proper foundation for testimony is an "evidentiary requirement that every trial attorney should understand." *Hernandez v. State*, 638 N.E.2d 460, 462 (Ind. Ct. App. 1994), *trans. denied*. It includes pointing the trial court to the governing foundational rule when necessary to prevent a "breakdown in the adversarial process," *Strickland*, 466 U.S. at 696.

An equally basic skill is preserving a claim of error in the exclusion of evidence—counsel must inform the court of the evidence's substance by an offer of proof, allowing for meaningful review on appeal. Ind. Evidence Rule 103(a)(2); *see State v. Richardson*, 927 N.E.2d 379, 385 (Ind. 2010); *Von Almen v. State*, 496 N.E.2d 55, 57 (Ind. 1986) ("The importance of establishing a record as a prerequisite to appellate review cannot be understated.").

Here, the evidence reveals that Weisheit's trial counsel neither laid a proper foundation for Aiken's testimony nor provided an adequate offer of proof. The evidence thus supports the post-conviction court's findings that counsel's failure to point the trial court to the proper foundational requirements was "error" and "not the result of poor strategy or bad tactics," and that counsel had not "made the proper offer of proof."

Despite these findings, the post-conviction court failed to draw the only conclusion that flows from them: that counsel's performance was deficient.

### a. The evidence supports the post-conviction court's findings that counsel's failure to point the trial court to the proper foundational requirements was "error" and "not the result of poor strategy or bad tactics," and that counsel did not make a "proper offer of proof."

At the penalty phase, counsel appropriately recognized that "mitigation includes . . . whether or not this particular individual poses a threat to the community, or to corrections officers, or to other inmates." For mitigation evidence on this front, counsel called and relied on James Aiken for expert testimony about Weisheit's ability to be incarcerated in the Department of Correction, including on a long-term basis, without undue risk of harm to others.

Aiken is a former Commissioner of the Indiana Department of Correction and has approximately forty-five years of experience with corrections, including developing and implementing inmate classification systems across the United States.

At the penalty phase, Aiken began to describe his background to the jury, but before his testimony filled two transcript pages, the State objected. The trial court then dismissed the jury and prompted Owens, "Tell me what [Aiken's] likely testimony's going to be, or maybe we want to get that from him . . . ." Owens tried to summarize Aiken's testimony, but the court remained uncertain about the evidence's substance. Rather than Owens providing clarity by questioning Aiken, Owens suggested the trial court do so:

> THE COURT: . . . Are you asking -- are you proposing that his testimony is going to be in the nature of projecting or offering an opinion as to whether or not the Defendant will be, and I'm -- these are my words, a disruptive influence in the prison system?
>
> MR. OWENS: Why don't you just ask Mr. Aiken.

THE COURT: No, I want to know what you're proposing to offer here, because I'm still not satisfied that he's got the qualifications to do that in a futuristic sort of way.

The trial court did eventually ask Aiken questions, gearing them toward the foundational requirements for expert **scientific** testimony under Indiana Evidence Rule 702(b). Counsel did not point the court to Rule 702(a), which spells out the less-stringent requirements for non-scientific expert testimony. The court ultimately excluded Aiken's testimony on Weisheit's future inmate classification because it did not meet Rule 702(b)'s requirements, but the court said that Aiken could testify on classification generally.

Counsel then asked if the court would also permit Aiken to "testify as to his review of Mr. Weisheit's records," which included jail records following Weisheit's arrest. The court responded, "Yes"—yet counsel withdrew Aiken as a witness without having Aiken testify about his review of those records concerning Weisheit's past adjustment to imprisonment.

Apart from Aiken's description of his own background, which he supplied before the State's objection, the jury heard nothing from Aiken. In the offer of proof, counsel did not clearly set out Aiken's review of Weisheit's past adjustment to imprisonment and other characteristics relevant to sentencing. So that information was not part of the foundation for Aiken's testimony on Weisheit's future inmate classification.

When Aiken testified at the post-conviction hearing, he provided his qualifications and extensive experience with prison classification. He listed some of the factors he considers in classifying inmates, including a diagnostic evaluation, age, medical and mental health, gang involvement, escape history, institutional violence or potential for violence within the facility, relationship with law enforcement, the nature of the offense, and the length of the sentence. He also confirmed that he applied these factors to Weisheit to form his opinion of Weisheit's ability to be secured, supervised, and managed in the Department of Correction. Then Aiken

provided his opinion on Weisheit's past adjustment to imprisonment and his individualized prediction for Weisheit's inmate classification.

For Weisheit's past adjustment, Aiken concluded:

> . . . I did not find anything that would give me an indication that his criminal history would cause an[y] issues . . . the Department of Correction[] could not anticipate or manage.
>
> . . . .
>
> . . . [F]rom the stand point of managing him for a long term basis, he did not present an unusual risk . . . . There were incident reports, disciplinary hearings and so forth in relationship to his behavior and I made assessments of each one . . . . And those type of misconduct reports were at the lower end of the spectrum as it relates to managing inmate population.

Aiken also explained that Weisheit had "stabilized very well" after moving from the Vanderburgh County Jail to the Clark County Jail, and that his opinion about Weisheit's adjustment to imprisonment was "further validated" by Weisheit's institutional history since the time of the penalty phase.

For his particularized prediction of Weisheit's inmate classification, Aiken concluded:

> [t]hat [Weisheit] could be adequately managed for the remainder of his life in a high security setting and that he could be . . . [a]dequately secured, supervised and managed within the Indiana Department of Correction without causing an undue risk of harm to staff, himself, other inmates, as well as the general community.

Also at the post-conviction hearing, Owens testified that he had not met with or spoken to Aiken until the morning of his testimony and that he was surprised by the State's objection.

After reviewing this evidence, the post-conviction court made the following findings on counsel's performance:

7. The jury learned Aiken's occupation was in corrections and prisons (Tr. 2357). He outlined his experience with various jurisdictions' prison systems. Aiken was cut off by a State's objection before the jury heard of his experience in Indiana. The jury heard nothing else from this witness.

. . . .

9[a]. . . . The court ruled it would allow Aiken to testify generally about classification, but not render any opinions as to how the State of Indiana would classify Weisheit if he received life without parole or a term of years. . . . Owens never corrected the court about its use of 702(b) foundational requirements.

9[b]. Owens withdrew Aiken without any further offer of proof. . . .

10. Owens testified at the post-conviction hearing he did not know until the morning of Aiken's testimony that he would be questioning Aiken. Aiken met briefly with counsel before he testified. . . .

11. Aiken has an undergraduate and graduate degree in criminal justice. He has worked for 45 years in the corrections industry. He has experience implementing techniques and protocols related to classification. He has participated in training programs related to classification. Aiken has been employed by various correctional facilities throughout the country and the Virgin Islands (PCR Ex. 23). He was the commissioner of the Indiana Department of Correction. . . . Aiken has helped design and implement classification systems throughout the country. . . . He has testified in several Indiana death penalty cases as to the ability of the Indiana Department of Correction to safely house an inmate without undue risk of harm to others.

. . . .

13. Prior to his testimony in 2013, Aiken reviewed Weisheit's criminal history, all institutional records from the Vanderburgh County Jail and the facts surrounding this crime (Tr. 2366). He also interviewed Weisheit (Tr. 2367). At post-conviction, Aiken testified he found the following information from those records relevant to his conclusion Weisheit posed a lower risk of violence in the Department of Correction: Weisheit's age of being in his late-30's because inmates' behavior tends to calm down in this age range; Weisheit had no previous history with gang activity which contributes to systemic violence in a prison; Weisheit had displayed very little

institutional violence; Weisheit maintained a relationship with his family which generally reduces the incentive for violence; and the nature of his crime being a crime against children would require a higher level of security for his safety. With regard to the behavior issues Weisheit had during the months after being arrested, Aiken testified that was not unusual given the stress of being incarcerated for the first time in a jail. Once moved to the Clark County Jail, Weisheit adjusted quite well. During his interview of Weisheit, Aiken observed his demeanor and how he appeared to be handling the stress of incarceration and the trial. Aiken did not find Weisheit to be cool, detached or aggressive.

14. Aiken testified that given all the circumstances, Weisheit would be incarcerated in a maximum security facility . . . . Aiken offered the opinion if Weisheit received a term of years or life without parole, he could be securely housed in a high security setting by the Department of Correction without undue risk of harm to prison staff or the other inmates.

15. Before the post-conviction hearing, Aiken reviewed Weisheit's Department of Correction history since his convictions. Aiken testified the records demonstrated Weisheit had made adequate adjustment to being incarcerated. Aiken noted two minor violations in three years. He did not see any evidence of random or systemic violence. These records validated his original opinion.

. . . .

17. . . . The [Indiana Supreme] Court opined [on direct appeal] that if counsel had made a more precise offer of proof detailing Weisheit's adjustment to imprisonment leading up to trial, it "could have possibly resulted in reversal of his death sentence." [*Weisheit*, 26 N.E.3d at 10.]

18. When deciding whether to impose a death sentence, the trier of fact may consider any appropriate mitigating circumstances. Ind. Code 35-50-2-9(c). It is a violation of the U.S. Constitution to fail to consider evidence of a defendant's adjustment to incarceration leading up to trial as mitigating evidence to weigh against the aggravating circumstances. *Skipper*, 476 U.S. at 3–5; *Wilkes v. State*, 917 N.E.2d 675, 690 (Ind. 2009).

. . . .

20. The trial court's use of foundational requirement[s] of Ind. Evid. R. 702(b) was error. Aiken's testimony was admissible under Ind. Evid. R. 702(a) . . . .

21. The subject matter here, whether the Department of Correction can adequately house Weisheit given his particular circumstances, is not a subject known to the average person. Aiken was qualified as an expert in classification and had specialized knowledge to assist the jury in determining a mitigating factor, the ability of Weisheit to be safely incarcerated without undue risk of harm to others, in weighing the decision between the death penalty, life without parole or a term of years. . . .

22. . . . Counsel's error was not the result of poor strategy or bad tactics. . . .

23. . . . Counsel was not prepared to handle any objections from the State. . . .

. . . .

26. . . . The jury did not hear . . . about any of the factors that weighed in favor of his imprisonment without undue risk to others. . . . The defendant must show there is a reasonable probability the result of the proceeding would have been different absent the deficient performance. [*Strickland*,] 466 U.S. at 693. The [Indiana] Supreme Court's own words demonstrate there is a reasonable probability of a different outcome had counsel made the proper offer of proof. . . .

The evidence supports the post-conviction court's findings. Counsel did not steer the trial court to Rule 702(a) when laying the foundation for Aiken's testimony. This failure ultimately led to the exclusion of mitigating expert testimony during Weisheit's penalty phase. Thus, the post-conviction court's finding that the failure was "error" and "not the result of poor strategy or bad tactics" is not clearly erroneous.

Similarly, counsel did not set out how Aiken's review of Weisheit's past jail records and other characteristics helped qualify Aiken to testify to Weisheit's future inmate classification. And counsel withdrew Aiken as a witness before Aiken was able to testify about Weisheit's past adjustment to imprisonment. This supports the post-conviction court's finding that counsel did not make a "proper offer of proof."

Long before Weisheit's penalty phase, the Supreme Court of the United States established the mitigating potential of testimony about a defendant's promising adjustment to prison. *See Skipper*, 476 U.S. at 4–5. Counsel was thus deficient in failing to present the jury with that

testimony when Aiken was prepared—and permitted by the court—to provide it at Weisheit's penalty phase.

### b. In evaluating whether counsel was deficient, the post-conviction court failed to measure counsel's performance using prevailing professional norms.

In rejecting Weisheit's Aiken-testimony claim, the post-conviction court concluded that "Weisheit has failed to show trial counsel's performance was to a level of deficiency that he was prejudiced . . . ."

Below, I address prejudice and elaborate on how this statement in the post-conviction court's order conflates *Strickland*'s performance and prejudice demands. But as far as the deficiency inquiry is concerned, counsel's performance should be measured by reasonableness under prevailing professional norms, *see Strickland*, 466 U.S. at 687–88, not by whether the performance "was to a level of deficiency that he was prejudiced."

Also undercutting the post-conviction court's no-deficiency assertion is this Court's suggestion on direct appeal that counsel's performance surrounding Aiken's testimony was deficient. As the post-conviction court recognized in its findings, we had already observed on direct appeal that:

> To be sure, had Aiken (or another expert) been prepared to testify as to Weisheit's adjustment to imprisonment throughout the time **leading up to** the penalty phase, then the trial court's exclusion of such testimony . . . would have been problematic and could have possibly resulted in reversal of his death sentence. . . .

> Further, we note that Weisheit did not help his case by failing to make a more precise offer of proof regarding Aiken's prediction of his specific future classification . . . . At no time during th[e] discussion [with the court] did Weisheit's counsel make a clear offer of proof by requesting permission from the

> trial court to ask Aiken a series of questions that counsel
> intended to ask at trial.

*Weisheit v. State*, 26 N.E.3d 3, 10 (Ind. 2015).

In other words, defense counsel's performance surrounding Aiken's testimony both prevented the jury from hearing valuable and admissible mitigating evidence and precluded the record from reflecting a clear offer of proof. Under the correct standard to evaluate deficiency—reasonableness under prevailing professional norms—the evidence and findings lead to only one conclusion: counsel's performance concerning Aiken's testimony was deficient.

In sum, the post-conviction court's own findings and the evidence as a whole compel the conclusion that three deficiencies marred counsel's penalty-phase performance.

I turn now to those deficiencies' cumulative impact on Weisheit's penalty-phase outcome.

## B. Counsel's performance deficiencies collectively prejudiced Weisheit.

A defendant overcomes the burden for *Strickland*'s prejudice prong by showing "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. The defendant is **not** required to "show that counsel's deficient conduct more likely than not altered the outcome in the case." *Id.* at 693. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Weisheit's burden, then, was to show a **reasonable probability** that without counsel's penalty-phase performance deficiencies, at least one juror would not have voted for the death penalty, and the trial judge would not have imposed that sentence. *See* I.C. § 35-50-2-9(e); *Wilkes v. State*, 917 N.E.2d 675, 693 (Ind. 2009).

In determining prejudice, reviewing courts consider "the totality of the available mitigation evidence"—presented both at trial and at the post-

conviction hearing—and "reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at 41 (alteration in original) (quoting *Williams*, 529 U.S. at 397–98).

The majority does not recognize any deficiencies in counsel's performance, so it does not engage in "the type of probing and fact-specific analysis" required to evaluate cumulative prejudice. *Sears v. Upton*, 561 U.S. 945, 955 (2010) (per curiam) (disapproving "the type of truncated prejudice inquiry undertaken by the state court"); *Baer*, 879 F.3d at 788 (finding that this Court's "pithy analysis on prejudice" for the defendant's cumulative-effect claim did not support our conclusion).

The post-conviction court likewise conducted no analysis of cumulative prejudice. Its explanation was a single sentence: "As discussed herein, the Court finds no errors, cumulatively or otherwise, that resulted in deficient performance of trial counsel or that were prejudicial to Weisheit."

Yet the post-conviction court's perfunctory conclusion does not square with its detailed findings on Weisheit's individualized claims—evidence-supported findings that point only to prejudice for Weisheit's cumulative-effect claim.

To start, the post-conviction evidence showed that the mitigation case would have been stronger had counsel contacted Dr. Harvey to testify. Dr. Harvey would have told the jury about his first-hand encounter with Weisheit while Weisheit was "in the middle of" a manic phase. His testimony would have countered the State's rebuttal witness, and his opinion would not have been diluted or abbreviated by Dr. Price.

Similarly, had counsel obtained the Boys School records and provided them to witnesses, the defense would have presented stronger mitigating testimony from Dr. Henderson-Galligan, Dr. Harvey, and Eccles-Skidmore. The Boys School records gave a more accurate picture of the extent of Weisheit's mental health issues, enmeshed family, and childhood troubles, and would have made Dr. Harvey's bipolar diagnosis "definitive."

Finally, had counsel more clearly offered Aiken's testimony about Weisheit's past adjustment to imprisonment and future inmate

classification, the jury would have heard evidence that Weisheit would not pose a danger if spared but incarcerated. *Skipper*, 476 U.S. at 5. Even if Aiken weren't permitted to testify to Weisheit's future classification, he could have testified to Weisheit's past adjustment to imprisonment. This is important because "the sentencer may not refuse to consider or be precluded from considering 'any relevant mitigating evidence.'" *Id.* at 4 (quoting *Eddings*, 455 U.S. at 114). And "there is no question," *id.*, that favorable inferences jurors might have drawn from Aiken's testimony about Weisheit's past adjustment to imprisonment "would be 'mitigating' in the sense that they might serve 'as a basis for a sentence less than death,'" *id.* at 4–5 (quoting *Lockett*, 438 U.S. at 604 (plurality opinion)).

The evidence thus supports the post-conviction court's corresponding findings in Weisheit's individualized claims, which include the following:

7. The jury learned Aiken's occupation was in corrections and prisons (Tr. 2357). He outlined his experience with various jurisdictions' prison systems. . . . The jury heard nothing else from this witness.

   . . . .

9[a]. . . . The court ruled it would allow Aiken to testify generally about classification, but not render any opinions as to how the State of Indiana would classify Weisheit if he received life without parole or a term of years (Tr. 2381-2383). . . . The court did not change his ruling. Owens never corrected the court about its use of 702(b) foundational requirements.

9[b]. Owens withdrew Aiken without any further offer of proof. . . .

   . . . .

13. Prior to his testimony in 2013, Aiken reviewed Weisheit's criminal history, all institutional records from the Vanderburgh County Jail and the facts surrounding this crime (Tr. 2366). He also interviewed Weisheit (Tr. 2367). . . .

14. Aiken testified that given all the circumstances, Weisheit would be incarcerated in a maximum security facility . . . . Aiken offered the opinion if Weisheit received a term o[f] years or life without parole, he could be securely housed in a high security setting by the Department of Correction without undue risk of harm to prison staff or the other inmates.

   . . . .

17. . . . The [Indiana Supreme] Court opined [on direct appeal] that if counsel had made a more precise offer of proof detailing Weisheit's adjustment to imprisonment leading up to trial, it "could have possibly resulted in reversal of his death sentence." [*Weisheit*, 26 N.E.3d at 10.]

18. . . . It is a violation of the U.S. Constitution to fail to consider evidence of a defendant's adjustment to incarceration leading up to trial as mitigating evidence to weigh against the aggravating circumstances. . . .

. . . .

20. . . . Aiken's testimony was admissible under Ind. Evid. R. 702(a) . . . .

21. . . . Aiken was qualified as an expert in classification and had specialized knowledge to assist the jury in determining a mitigating factor, the ability of Weisheit to be safely incarcerated without undue risk of harm to others, in weighing the decision between the death penalty, life without parole or a term of years. . . .

. . . .

26. . . . The jury did not hear how Weisheit adjusted to incarceration nor did they hear about any of the factors that weighed in favor of his imprisonment without undue risk to others. Further, the Indiana Supreme Court said on direct appeal that if Aiken had been prepared to testify to Weisheit's adjustment leading up to [the] penalty phase, exclusion of his testimony "would have been problematic and could have possibly resulted in reversal of his death sentence." . . . The Supreme Court's own words demonstrate there is a reasonable probability of a different outcome had counsel made the proper offer of proof. Had the jury heard this mitigating evidence, there is a reasonable likelihood the jury would have given Weisheit's case for mitigation greater weight and returned a verdict for something less than death.

. . . .

4. . . . A report from the Boys School records . . . indicated that while Weisheit was in the psychiatric unit of Methodist Hospital after attempting suicide at the Boys School, he suffered a psychotic break (PCR Ex. 5). Owens testified if there was evidence Weisheit had a psychotic break while at Methodist Hospital, that would have been important to provide to the defense team's experts.

5. Dr. Henderson-Galligan and Dr. Harvey both relied on information found in the Boys School records in forming their opinions about Weisheit's

Bipolar diagnosis. Dr. Henderson-Galligan testified the Boys School records showed Weisheit was prone to downplay his struggles during his teen years. She noted Weisheit's extent of suicidal ideation was important in demonstrating the severity of Weisheit's mental health issues. Psychiatric records found in the Boys School records described Weisheit's family as "deeply chaotically enmeshed." This information was important in understanding Weisheit's mental health issues. . . . The records showed Weisheit had been prescribed three different anti-depressants over the course of a year. This showed a significant, ongoing issue with treating Weisheit's depression.

6. Dr. Harvey testified . . . [that the Boys School] records established an extended period of depression and mania. With those records, Dr. Harvey testified he could have made a definitive diagnosis.

7. . . . In contrast to her brief testimony at the penalty phase, Skidmore provided significantly more detailed information about the Boys School and Weisheit's access to care. This was in part because she was able to review documents from the Boys School records which were prepared by her.

. . . .

13. . . . [H]ad counsel been armed with the Boys School records, he would have been able to present to the jury information about the school's resources and the rarity of Weisheit's placement at Methodist. Skidmore could have been a much more compelling witness for the defense but for counsel's deficiencies.

. . . .

22. A comprehensive evaluation [in the Boys School records showed that Weisheit's parents] . . . allowed [his] prescription to run out and did not refill it. Dr. Henderson-Galligan noted the importance of this information because it supports the conclusion that this is an enmeshed family. The failure to monitor and continue the medication reflects a poor choice within the family unit. The evaluation revealed that because Weisheit spent an extensive period of time in Methodist, it was likely the symptoms were genuine and not malingered and the primary cause of Weisheit's difficulties was a mental illness. The documents also reflect Weisheit suffered a psychotic break while being treated at Methodist. It was noted this may reoccur under stress. Dr. Henderson-Galligan testified that once one suffers a psychotic break it is more likely to happen again.

. . . .

[under the heading of CONCLUSION] . . . Valuable information was not presented because [counsel] had not located the [Boys School] records and counsel did not interview Skidmore. The records that were provided to the jury reflected very little of the compelling evidence of Weisheit's mental illness or the role his family played in failing to follow through with treatment. Dr. Harvey and Dr. Henderson-Galligan testified at the Post-Conviction hearing to the importance of these records in reaching an accurate and complete diagnosis. The Boys School records document lengthy treatment for a major mental illness, one which included that Weisheit suffered a psychotic break. . . . The evidence presented at trial, taken together with the post-conviction evidence, is the type of "evidence about the defendant's background and character (that) is relevant because of the belief, long held by [this] society, that defendants who commit criminal acts that are attributable to a disadvantaged background[,] or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251–52 (2007) (internal citations omitted).

. . . .

10. Dr. Harvey reviewed Ind. Code 35-50-2-9 and determined Bipolar Disorder is considered an extreme mental or emotional disturbance under Ind. Code 35-50-2-9(c)(2) and also could be a mental disease or defect under Ind. Code 35-50-2-9(c)(6).

11. . . . Due to counsel's mistake, Dr. Harvey was not provided the necessary documentation of evidence supporting the episodic nature of Bipolar Disorder and the Boys School records reflecting the long term treatment for Major Depression. . . .

12. Dr. Price's testimony reflected some of Dr. Harvey's observations. However, he could not testify to Dr. Harvey's opinion and therefore had to dilute the information collected by Dr. Harvey and incorporate it in his opinion finding that Dr. Harvey's observations were "consistent with Bipolar Disorder." (Tr. 2430).

13. Dr. Harvey's testimony could have been used to rebut the State's expert, Dr. Allen. Dr. Allen testified Weisheit had been incarcerated for three years and never had a manic episode during that time (Tr. 2504). Dr. Harvey observed a manic phase during this time. Dr. Allen also testified Bipolar was not likely in Weisheit's case because Bipolar is progressive and the

episodes become more frequent (Tr. 2504, 2516). Dr. Harvey testified that Weisheit's symptomology was consistent with 40% of the cases.

14. . . . Dr. Harvey's opinion would have supported two statutory mitigators and would have effectively rebutted Dr. Allen's testimony. The State exploited counsel's failure and argued there was no evidence of these two statutory mitigators (Tr. 2568-2569). By failing to contact Dr. Harvey, the defense was left with one expert to testify to the cognitive disorder and Bipolar Disorder. Trial counsel's own assessment of the credibility of Dr. Price's testimony reflects the magnitude of this error.

The conclusion that flows from these findings and the evidence as a whole is to me inescapable: Weisheit suffered prejudice from the cumulative effect of counsel's performance deficiencies. Even if no single deficiency, standing alone, renders Weisheit's death sentence unreliable, together they certainly "undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

The majority discounts the effect of Dr. Harvey's absence, reasoning that Dr. Price incorporated Dr. Harvey's two-page summary report into his testimony. But Dr. Price's presence did not make up for Dr. Harvey's absence. Dr. Harvey saw Weisheit for two to three hours "in the middle of" a manic episode; he could have described to the jury his in-person observations, which directly opposed the testimony of the State's rebuttal witness. Dr. Price, on the other hand, did not see Weisheit in the middle of a manic episode, had trouble remembering who Dr. Harvey was, and abridged Dr. Harvey's written observations into 175 words for the jury.

As the post-conviction court determined, Dr. Price "dilute[d]" Dr. Harvey's opinion. Especially since the jury's questions to Dr. Price and to Dr. Allen demonstrated particular interest in how bipolar disorder might have affected Weisheit, I believe that Dr. Harvey's testimony would have materially strengthened the mitigation case.

The majority similarly understates the effect of the Boys School records, citing the records' references to Weisheit's lack of remorse and poor behavior. Even those references, however, show the extent of Weisheit's troubled youth and mental illness. The records are therefore relevant and mitigating "because of the belief, long held by this society, that defendants

who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 251–52 (2007) (quoting *Franklin v. Lynaugh*, 487 U.S. 164, 184 (1988) (O'Connor, J., concurring in judgment)). And as the post-conviction court found, the Boys School records revealed that "the primary cause of Weisheit's difficulties was a mental illness."

The majority also discounts (as the post-conviction court did) the importance of the Boys School records because they did not **conflict** with Dr. Henderson-Galligan's opinion at trial. True, they did not conflict with her opinion or those of Dr. Harvey and Eccles-Skidmore; they made those mitigating opinions **stronger**. Because the prejudice inquiry depends on the balance of aggravators and mitigators, adding enough weight to the mitigating side of the scale—or lifting enough weight from the aggravating side—makes all the difference. *See Porter*, 558 U.S. at 41–42; *Rompilla*, 545 U.S. at 386 n.5, 390–93; *Wiggins*, 539 U.S. at 537–38.

As for Aiken's testimony, I disagree with the majority that the admissibility of Aiken's testimony is speculative. The post-conviction testimony shows Aiken's qualifications to make an individualized prediction for Weisheit's inmate classification, and the post-conviction court determined that "Aiken's testimony was admissible."

Even if Aiken could not have opined on Weisheit's future classification, he could have testified about Weisheit's past adjustment to imprisonment. The trial court specifically told defense counsel that Aiken could testify to his review of Weisheit's records, which included those from the Vanderburgh County Jail where Weisheit was housed after his arrest. And—as the post-conviction court found—Aiken had interviewed Weisheit; reviewed his criminal history, all institutional records from the Vanderburgh County Jail, and the facts surrounding the crimes; and "had specialized knowledge to assist the jury in determining a mitigating factor, the ability of Weisheit to be safely incarcerated without undue risk of harm to others."

In short, Aiken was prepared at Weisheit's penalty phase to testify to Weisheit's past adjustment to imprisonment. Yet counsel withdrew Aiken,

keeping the jury from learning not only that Aiken "did not find anything that would . . . indicat[e] that his criminal history would cause an[y] issues . . . the Department of Correction[] could not anticipate or manage," but also that Aiken believed Weisheit's misconduct in jail was "at the lower end of the spectrum."

This Court recognized on direct appeal that Weisheit's case suffered from counsel's failure to provide a precise offer of proof, particularly because the offer of proof that counsel supplied omitted Aiken's evaluation of Weisheit's past adjustment to prison:

> To be sure, had Aiken (or another expert) been prepared to testify as to Weisheit's adjustment to imprisonment throughout the time **leading up to** the penalty phase, then the trial court's exclusion of such testimony—assuming the proper foundation had been laid and it was otherwise admissible—would have been problematic and could have possibly resulted in reversal of his death sentence. . . .
>
> Further, we note that Weisheit did not help his case by failing to make a more precise offer of proof regarding Aiken's prediction of his specific future classification . . . . Perhaps if Aiken had made a detailed prediction as to Weisheit's potential classification, and if Weisheit had established that Aiken had adequate qualifications and experience in predicting inmates' future behavior (beyond the prediction inherent in classifying inmates), then we may not have agreed with the trial court that Aiken's potential testimony was speculative and thus inadmissible.

*Weisheit*, 26 N.E.3d at 10.

In light of the post-conviction evidence and the post-conviction court's findings, I believe that Weisheit has met his burden to show a reasonable probability that at least one juror and the sentencing judge "would have struck a different balance" without counsel's collective deficiencies. *Wiggins*, 539 U.S. at 537. This is not a case where the new evidence

presented at the post-conviction proceeding "would barely have altered the sentencing profile presented" at Weisheit's penalty phase. *Porter*, 558 U.S. at 41 (quoting *Strickland*, 466 U.S. at 700). Rather, the jurors were denied an accurate picture of Weisheit's mental health issues and troubled youth. Nor did they encounter any expert testimony about Weisheit's past adjustment to imprisonment, which might have served as a basis for a sentence less than death. Perhaps that information would have swayed the jurors' judgment, or perhaps not—but it is significant enough to "undermine confidence in the outcome," which is all that *Strickland* requires. 466 U.S. at 694.

Weisheit's crimes are undeniably horrific—at the far end of the spectrum. The defendant's culpability for crimes, though, is not the only factor that jurors may—and must, if presented with mitigating evidence—consider in deciding whether to sentence someone to death. *See* I.C. § 35-50-2-9(c), (l); *Skipper*, 476 U.S. at 4–5; *Eddings*, 455 U.S. at 116–17. If it were, counsel's obligation to thoroughly investigate the defendant's background would not attach in every death penalty case. *See Porter*, 558 U.S. at 39–40; *Stevens v. McBride*, 489 F.3d 883, 887, 896–98 (7th Cir. 2007). This requirement exists in part because evidence may be mitigating even if inferences from it "would not relate specifically to [the defendant's] culpability for the crime he committed," *Skipper*, 476 U.S. at 4.

The post-conviction court's conclusion for Weisheit's cumulative-effect claim opposes the court's own findings and the evidence as a whole. That is reason enough to reverse the post-conviction court's cumulative-effect holding and allow a new penalty phase.

But there is another problem with the post-conviction court's cumulative-effect conclusion: it is built on improper legal standards.

## II. The post-conviction court's conclusion rests on improper legal standards.

Even if we could ignore the conflict between the post-conviction court's evidence-backed findings and its cumulative-effect conclusion, that conclusion rests on improper legal standards.

As explained above, the post-conviction court did not conduct a separate analysis for the cumulative-effect claim. Rather, it relied entirely on its decisions for Weisheit's more individualized claims of ineffective assistance. The court's decisions on those individualized claims harbor two legal errors that ultimately corrode the court's derivative cumulative-effect conclusion.

First, the post-conviction court conflated *Strickland*'s deficiency and prejudice prongs, reasoning that "Weisheit has failed to show trial counsel's performance was to a level of deficiency that he was prejudiced and that but for trial counsel['s] performance the results of the proceedings would have been different."

Whether counsel's performance was deficient does not depend on prejudice—rather, deficiency is measured against prevailing professional norms. *See Strickland*, 466 U.S. at 687–90. And although the severity of a deficiency may affect whether the defendant suffered prejudice, under *Strickland*, deficiency and prejudice are distinct inquiries, *id.* at 687–96; *Timberlake*, 753 N.E.2d at 603. Because the post-conviction court commingled the two, its cumulative-effect conclusion rests on a misdirected analysis.

Second, the court applied a heightened prejudice standard, concluding that "there is no reasonable likelihood the jury would have unanimously voted against death." Weisheit did not need to show a reasonable likelihood that the jury would have unanimously voted against death. Unanimity in the jury's sentencing recommendation binds the trial court to impose the recommended sentence. *See* I.C. § 35-50-2-9(e). And, here, following Weisheit's penalty phase, the jury unanimously recommended death, so the judge was required to impose that sentence.

But if even **one** juror had voted against death, the trial court's responsibilities would have been different. *See* I.C. § 35-50-2-9(f). The court would have had discretion in sentencing Weisheit, *id.*, and thus would have borne the "truly awesome responsibility" to decide whether to impose the death penalty, *Caldwell v. Mississippi*, 472 U.S. 320, 341 (1985). In making that decision, the lack of unanimity among the jurors would have been a relevant consideration, since a conflicted jury "demonstrate[s]

a level of uncertainty among the citizens" as to the appropriate penalty. *Wilkes*, 917 N.E.2d at 693. And in imposing the death penalty—which "calls for a greater degree of reliability," *Lowenfield*, 484 U.S. at 239 (quoting *Lockett*, 438 U.S. at 604 (plurality opinion))—courts should be "particularly sensitive to insure that every safeguard is observed," *Gregg*, 428 U.S. at 187 (plurality opinion).

So, Weisheit's burden under *Strickland*'s prejudice prong was to show a reasonable probability that without counsel's errors, at least one juror would not have voted for the death penalty and the trial court would not have imposed that sentence. Given the mitigation evidence that would have been presented but for counsel's deficient performance, I believe there is a reasonable probability that the jury would have been conflicted and that the judge would not have sentenced Weisheit to death.

In concluding otherwise, the post-conviction court relied on improper legal analysis.

# Conclusion

The post-conviction court's cumulative-effect conclusion contravenes both the evidence and the court's own findings, and it stands on improper legal standards. The majority affirms the post-conviction court's cumulative-effect decision by dismissing contradictions between the post-conviction court's findings and its conclusion and by asserting that Weisheit has failed to carry his burden under *Strickland*.

I believe that the majority's cumulative-effect holding misapplies *Strickland* and deviates from our standard of review. In my view, Weisheit was denied his Sixth Amendment right to effective assistance of counsel at the penalty phase of trial. And he has carried his burden to show that there is no way within the law that the post-conviction court could have arrived at its cumulative-effect conclusion. Though Weisheit's offenses were horrific and his guilt is clear, he should be afforded a penalty phase untainted by constitutional error.

I therefore respectfully dissent in part.